The TEXAS COMPANY, Appellant,

v.

Mrs. Josie Kate GIANFALA, widow of Oscar J. Martin, et al., Appellees.

No. 15404.

United States Court of Appeals Fifth Circuit.

May 13, 1955.

Rehearing Denied June 17, 1955.

lees, Mrs. Josie Kate Gianfala, Widow of Oscar J. Martin, et al.

Before HUTCHESON, Chief Judge, HOLMES, Circuit Judge, and DAWKINS, District Judge.

HUTCHESON, Chief Judge.

Appellee, plaintiff below, the widow and administratrix of Oscar Martin, deceased, in life an employee of appellant, defendant below, sued as a first cause of action under the Jones Act, Section 688, 46 U.S.C.A., for the damages resulting from his death, and, in the alternative, and as a second cause of action, for workmen's compensation under the provisions of the Louisiana Revised Statutes of 1950, 23:1021 et seq.

The claim under the Jones Act was that, while a seaman and a member of the crew on Barge No. 76 and engaged in unloading drilling tubing by means of a hydraulic lift, deceased met his death as a result of the negligence of defendant in not providing him a safe place to work and in not furnishing safe tools and appliances to work with.

In reply to the first cause of action, the defendant filed an answer consisting of five defenses,[1] while, in reply to the second cause of action, the defendant answered that it had tendered to Mrs. Martin workmen's compensation in full and complete settlement of all claims which she and her minor child had against the Texas Company, and that the tender was refused by Mrs. Martin.

The case under the Jones Act, on the first cause of action, was tried to a jury, with the understanding between the counsel and court that all issues under the second cause of action for compensation would be tried and decided by the court.

The evidence, on which appellant and appellee rely to support their respective

Ernest A. Carrere, Jr., and May & Carrere, New Orleans, La., for appellant.

Russell J. Schonekas and Tucker & Schonekas, New Orleans, La., for appel-

1. First, that the complaint failed to state a claim upon which relief may be granted; second, that plaintiff was not properly qualified to maintain an action under the "Jones Act"; third, a general denial; fourth, that the Texas Company was guilty of no negligence and that the hydraulic lift in question was of a standard make and model; and that it was properly maintained and manned.

contentions, consisted of the undisputed, undiscredited, and unimpeached testi-mony [2] of one witness called by plaintiff, Carroll Taylor, the driller in charge, at

2. As to the nature and character of the drilling barge and of deceased's work as a member of a drilling crew on and in connection with the barge, Taylor testified in substance as follows:

That he was in charge of the rig at the time of Martin's death. The employees on the rig were on duty for six days and off duty for six days, alternately. During the time that they were on duty, they were brought to The Texas Company camps by speedboats and to the rigs by said boats. They worked for twelve hours per day and were off twelve hours per day during that six day period.

At the time of his accident, Martin was working aboard a drilling barge called the "Shea". According to the witness, this barge was approximately 56 feet wide and 122 feet long. A boiler barge, approximately 65 or 70 feet long and about 30 feet wide was used in conjunction with the drilling barge. The drilling barge draws approximately six feet of water and the boiler barge draws about four feet of water.

If Martin, or the fireman on duty at the time the barges were moved, happened to be aboard, they would ride the boiler barge from one location to another. According to the witness, "He (Martin) didn't have anything to do as far as moving it. He raised it and that was all. In other words, he jetted it out, pumped the barge out, because the barge on location is sunk, and, after he gets ready to move the barge, it is pumped out, and it was his job of seeing to it that it was floated up and, when they got to the location, to sink it back right where it was supposed to be."

In connection with Mr. Martin's duties to float the barge when it was moved from one location to another, Taylor testified that water was jetted out of the barge with steam pressure and that all Martin had to do was to open and close the two-inch valves. When questioned by Counsel as to how often the "Shea" was moved from one location to another, the witness testified: "Well, it must be at least, easily, once a year. Well, we could say that—I am just guessing on that—and that would be a period of about ten years that I have been knowing him, so I would feel safe in saying, ten or twelve, or at least ten to twelve moves. I know that I would be safe in saying that, and I mean that is not counting—." Counsel for the plaintiff attempted to show that Mr. Martin maintained the hull of the barge, but, when Taylor was asked who would repair a leak, he answered that a welder on the lease is brought out to make repairs.

There were no navigation lights on the barge and only the lights used in the drilling operations were available. At the time of Mr. Martin's accident, the drilling barge "Shea" was sunk to the bottom, with tons of water holding it fast to the bottom. Its spuds were in place and, around the drilling hole, piles had been driven and board planking nailed to the vertical piles to guide the "Shea" snugly to the well site and to assist in holding it in place.

In describing the accident, Mr. Taylor said: "We were unloading pipe off the barge onto the drilling barge, and it was placed on a rack, on the pipe-rack, and while these two men were untying this pipe, this man was killed when he was rolling the pipe. In other words, as they would untie, he would roll the pipe over out of the way, and this boom fell and killed him. Taylor stated that the lift involved in the accident was an upright hydraulic lift and that the piston, which was contained within a cylinder, blew out of its housing and fell from about 25 feet, striking Martin on the head. Apparently, a plate had become unscrewed, which permitted the piston to free itself.

Under cross-examination, Mr. Taylor was asked to explain his reference to the word "crew" used in his testimony. He stated that he had reference to a drilling crew and not to the crew of a ship; that he had never qualified as a captain of a ship or as a tankerman and had never worked for any shipping company; that the drilling crew aboard the "Shea" were not seamen, never were called upon to sign Seamen's Articles, did not sleep aboard the "Shea", were paid by the hour and enjoyed payment for overtime when they worked over the legal limit per week.

Mr. Taylor identified the picture exhibit "T–A" as the type of camp that The Texas Company drilling employees lived in when on duty in this area. By a reference to this and to the other exhibits, marked "T–A" through "T–D" it will be seen that these camps are elaborate structures of a permanent nature. The exhibits "T–F" through "T–H" were then filed. They show the elaborate sleeping and eating quarters in the various camps.

When the men were brought to camp or moved from camp to the rig, the members of the drilling crew did not operate

the time of the accident and for a long time before, of the rig, the drilling operations and the regular drilling crew, of which Martin was a member.

No other witness was offered by either plaintiff or defendant, but instead of bringing the six employees of the defendant who were present at the time of the accident to testify, the parties agreed that if these six men were called, they would testify substantially to the same things, the same facts that Mr. Taylor had testified to.

Whereupon both plaintiff and defendant resting, the defendant moved for a directed verdict on the ground that upon the undisputed evidence, deceased was, as matter of law, not a seaman and a member of the crew of a vessel plying on navigable waters in furtherance of commerce, but was a member of a drilling crew using the sunken and fast barge as a part of the equipment for drilling an oil well.

In addition, defendant insisted that the evidence had failed to show any negligence or fault on defendant's part and that for both of these reasons a verdict should be directed for the defendant as matter of law.

The district judge, stating, "Let the record show that the motion is denied on the basis of McKie v. Diamond Marine Co. [5 Cir.], 204 F.2d 132", denied the motion, and after a verdict for plaintiff for $40,000 had come down, the court [3] denied a motion for judgment notwithstanding the verdict, and, a remittitur of $6000 having been entered, denied the motion for a new trial and entered judgment for plaintiff for $34,000.

Appealing from that judgment, defendant is here insisting that the district judge erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict, and that the judgment must be reversed and here rendered for defendant without prejudice, however, to and reserving the right of plaintiff or other legal representative of decedent to compensation under the Louisana State Compensation Act or the Longshoremen and Harbor Workers Act, 33 U.S.C.A. § 901 et seq.

On her part, appellee urges upon us that, though there were no discrepancies, contradictions or conflicts in Taylor's testimony, and though it was not disputed in any particular but, on the contrary, it is admitted that the facts he

the small boat which carried them; that in the event that Mr. Taylor or any other member of the drilling crew wanted to quit tomorrow, he could do so.

As to the barge "Shea", he testified that it is used for drilling for oil, that it could be used for any other type of drilling, and that it had only been used in the Lake Pelto-Bay Sainte Elaine-Lake Barre and Caillou Island area. Questioned about the location of the "Shea" at the time of Martin's accident, he stated that they were at a location known as "Terrebonne No. 51", which is The Texas Company's designation for Well No. 51 in that area. The "Shea" was on the bottom. It was sunk by water, which flooded the compartments. According to the witness, the "Shea" was sitting firmly on the bottom.

At the time of the accident, the boilerman's primary duties were in conjunction with the boiler-room; it is his duty, according to the witness to fire the boilers which give power to the drilling rig. Besides Mr. Martin and the witness Taylor,

there were four other men on the "Shea". The primary duties of Webster Hebert, the derrick man, were to work in the derrick and to maintain the drilling mud and the pump used to force it into the drilling hole. Mier and Eddie Marcel were floor men, who worked on the rotary floor at the site where the tubing is injected into the ground in the drilling operations.

As of the time of the accident, the "Shea" had been on location for approximately 22 days. The casing crew had used the lift or hoist in question the night before. They had handled seven-inch casing and had inserted it into the well hole to a depth of about 11,500 feet.

3. Saying: "I think it is a very close point and without the McKie case you possibly would have gotten a directed verdict. I really don't know but in view of the McKie case, I don't think I am in a position to direct a verdict at this time. I think I am going to let the Court of Appeals worry about that one."

testified to are true, a jury question was presented and the refusal to direct a verdict was not error.

We cannot agree with this view. Indeed, we think it presents the untenable theory that when the matter in question is whether one is a seaman and member of a crew, so as to come under the Jones Act, the function of the jury is not merely to determine what the facts are, but what law should be applied to the proven and admitted facts. Appellee thus sponsors this claim, that whether a person is a seaman and a member of a crew, is always, no matter what the testimony is, a question for the jury, and in no case of this kind can a verdict be instructed on that issue.

■ To sustain this view, appellee quotes from Gahagan Const. Corp. v. Armao, 1 Cir., 165 F.2d 301, 305, a sentence which does not at all support it but merely gives correct expression to the generally accepted view that "Even if the facts are undisputed, the question of whether a party is a member of the crew *is not necessarily one of law. If different conclusions may be drawn from the facts, the determination of the finder of the facts must stand."* (Emphasis supplied.) This is but the statement of the rule that where the matter to be determined is not merely the facts testified to but what fact inference could, or should, be drawn from them, as for instance whether the conduct testified to measures up to the proper standard of care or furnishes a basis for an inference as to intent, motive, or purpose, though the facts testified to are not in dispute, there may still be room for a jury verdict.

■ In our opinion, this case, as to the defense that the facts stated will not, as matter of law, support an inference of negligence or want of care, presents a good example of the application of the generally prevailing rule, that whether conduct conforms to the legal standard of care, must ordinarily be left to the jury. For, though the facts as to the occurrence are all undisputed, the question of whether the conduct testified to conformed to what a reasonably prudent man should or should not have done under the circumstances is not so completely settled by the evidence as to make its determination a matter of law.

When it comes, however, to the question whether, under the undisputed facts, plaintiff's decedent, at the time and place and under the circumstances of his injury, was a seaman and a member of the crew of a vessel engaged in commerce, there is no room for different fact conclusions to be drawn. Because, in short, the facts are all testified to in only one way, are in substance agreed to, the case as to whether the Jones Act is applicable presents under this evidence not a question of fact to be determined by a jury but a question of law to be determined by the judge, and the judge was obliged to hold as matter of law that at the place and time in question plaintiff's decedent was not a "seaman in being" and a member of a crew engaged in navigation.

The writer dissented in the McKie case not from the governing legal conclusions as to the proof required to constitute one a seaman and a member of a crew of a vessel, indeed in his dissent he stated his complete agreement with those conclusions. He was of the opinion, however, an opinion which his associates did not share, that there was no conflict whatever in the facts and there was therefore no room or basis for the view contrary to that which the district judge had taken, that, as matter of law, McKie was not a seaman and member of a ship's crew. The writer's difference with the other members of the court was therefore not as to what was required in law to constitute one a seaman and member of a crew. The difference between the members of the court was one which is constantly arising, where there are many witnesses each testifying differently, as to whether or not a real conformity runs through the testimony, unifying it all, so that under the rule of right reason, reasonable minds cannot draw different fact conclusions.

Here, under the evidence, the facts are not, they cannot be, in dispute, because

only one witness testified and no one points to or even claims that there were any discrepancies or conflicts in his testimony.

Under these circumstances, we think it clear that the submission of this cause to the jury was to submit to it a question of law which it was the duty of the court itself to determine. In Brady v. Southern Railway Co., 320 U.S. 476, at pages 479–480, 64 S.Ct. 232, at page 234, 88 L.Ed. 239, the court thus correctly states the rule:

"When the evidence is such that *without weighing the credibility of the witnesses* there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict." (Emphasis supplied.)

■ That this court, in the McKie case [204 F.2d 136] did not lay down the *legal principle in effect contended for by appellee, that in every case, no matter what the state of the evidence, the question of whether a person is a seaman and a member of a crew so as to come under the Jones Act, presents a question of fact for the jury,* is conclusively shown by the fact that, holding that "the essential and decisive elements of the definition of a 'member of a crew' are that the ship be in navigation; that there be a more or less permanent connection with the ship; and that the worker be aboard primarily to aid in navigation", we cited in support of that holding Desper v. Starved Rock Ferry Co., 188 F.2d 177, in which the Court of Appeals for the Seventh Circuit, reversing the district court, had held as a matter of law that the deceased in that case was not a seaman. It is even more significant that when the matter reached the Supreme Court, that court likewise held,[4] *as a matter of law,* that deceased was not a seaman.

■ When the accident, on which this suit is based, took place, the vessel was not in navigation, nor was Martin aboard it in the aid of navigation. On the contrary he was aboard it, *not as a member of a ship's crew* but as *a member of a drilling crew.* He was then and there doing work which is done strictly and only by oil field workers, handling the tubing to be used in completing the well and he was certainly not a "seaman in being".

If this decision below, and the contention of appellees, that a member of an oil-field drilling crew is a seaman and a member of a crew of a vessel, *merely because the jury said he was,* is sustained, it can only be because the ordinary principles governing the function of court and jury, in a trial in the federal court, have been departed from, indeed abandoned.

On the authority of the McKie case, supra, and of Desper v. Starved Rock Ferry Co., supra, the judgment is re-

4. "* * * The many cases turning upon the question whether an individual was a 'seaman' demonstrate that the matter depends largely on the facts of the particular case and the activity in which he was engaged at the time of injury. The facts in this case are unique. The work in which the decedent was engaged at the time of his death quite clearly was not that usually done by a 'seaman.' The boats were not afloat and had neither captain nor crew. They were undergoing seasonal repairs, the work being of the kind that, in the case of larger vessels, would customarily be done by exclusively shore-based personnel. For a number of reasons the ships might not be launched, or he might not operate one. To be sure, he was a probable navigator in the near future, but the law does not cover probable or expectant seamen but seamen in being. * * * In the words of the court in Antus v. Interocean S.S. Co., 6 Cir., 108 F.2d 185, 187, where it was held that one who had been a member of a ship's crew and was injured while preparing it for winter quarters could not maintain a Jones Act suit for his injuries: 'The fact that he had been, or expected in the future to be, a seaman does not render maritime work which was not maritime in its nature.'" Desper v. Starved Rock Ferry Co., 342 U.S. 187, at pages 190–191, 72 S.Ct. 216, at page 218, 96 L.Ed. 205.

versed and here rendered, without prejudice to, and fully reserving all rights of plaintiff or other legal representative of deceased to compensation.