Richard C. CHESSER, Libelant,

v.

GENERAL DREDGING CO., Inc., a Florida corporation, Respondent.

No. 394.

United States District Court,
S. D. Florida, Tampa Division.

April 19, 1957.

C. J. Hardee, Jr., Tampa, Fla., for libelant.

Victor O. Wehle, St. Petersburg, Fla., for respondent.

BARKER, Chief Judge.

This is an action by Richard C. Chesser against General Dredging Co., Inc., to recover maintenance, cure and wages to the end of the voyage as a result of an injury suffered by libelant on March 29, 1955, while in the employ of the respondent. At the hearing, libelant dropped his claim for wages and seeks to recover past due maintenance and the expenses of his cure, some of which have already been incurred, and for future cure, which will include surgery, and for future maintenance during the period of his disability reasonably expected to follow the anticipated surgery.

### Findings of Fact

1. Libelant, Richard C. Chesser, was employed by respondent, General Dredging Co., Inc., beginning on March 27, 1955, as mate aboard the General Dredge No. 1. Libelant had previously been employed aboard this dredge in the West Indies in 1954.

2. The respondent was engaged in general dredging operations in the Gulf of Mexico and Caribbean Sea in various ports and harbors both on the mainland and in the West Indies and was the owner and operator of General Dredge No. 1.

3. General Dredge No. 1 consists primarily of three pieces of equipment: The dredge itself, which is 54½ feet long with a draft of 2½ feet and a cutting head of 10 inches capacity; a derrick barge approximately 20 feet by 16 feet; and a small 22 foot inboard launch. The dredge has no motive power of its own and no facilities for eating or sleeping aboard except when emergency provisions are made for this purpose on long voyages. She moves herself while dredging by walking on spuds. She is moved for short distances by the inboard launch and on tows of any substantial distance by a tugboat hired for that purpose. The derrick barge contains a winch which is used to raise and lower the anchors which hold the dredge in place. The launch is used to haul the crew back and forth from the dredge to shore, dredge to barge, etc., and to work the dredge pipe on the water. The other essential equipment of the dredge is dredge pipe and pontoons. The pontoons float the pipe over water to the place where the spoil from dredging operations is dropped.

4. The crew of the dredge consists of a leverman, who operates the dredge itself, an engineer, who operates the motors and generators on the dredge, a mate and 3 to 5 deckhands.

5. Libelant Chesser was mate and as such was in charge of the deckhands. It was his duty to operate the launch, handle the derrick barge and supervise the moving and maintaining of the dredge pipe. It was his responsibility to assure that the spoil was properly placed and a proper grade maintained.

6. On March 29, 1955, respondent was performing a contract with the owners of Frazier Beach in Tampa, Florida. This contract required the use of General Dredge No. 1 to dig a channel approximately ¼ mile long and 75 feet wide to a depth at mean low tide of 7 feet from the entrance to Tampa Bay Marina, also owned by the owners of Frazier Beach, across flats, which were at all times covered by water, to a point where the water of Tampa Bay was a depth of 7 feet or more. The new channel was dug on approximately a straight line from the Marina entrance to deep water and was to replace

the former zigzag channel to the Marina. Spoils from the dredging operation were deposited parallel to the channel in such a manner as to protrude above the high water mark and furnish additional beach space for Frazier Beach. Tampa Bay Marina is a private yacht basin with facilities for about 75 boats. It can accommodate boats up to 50 feet in length and 6 feet draft. It primarily houses pleasure craft which ply the waters of Tampa Bay and the Gulf of Mexico for fishing and pleasure purposes. The route commonly used by these vessels is from the channel of the Marina through the navigable portions of Tampa Bay, using the main ship channels and out into the Gulf of Mexico, sometimes going as far as Boca Grande and Miami.

7. On March 29, 1955, libelant was working the second watch, from 4:00 P.M. to midnight. Only one deckhand showed up for work that day. At about 5:30 P.M. libelant and the lone deckhand were attempting to disengage a piece of dredge pipe which was stuck in the mud on the fill. While trying to lift the pipe libelant strained his back and ruptured an intervertebral disc in the lower part of his spine.

8. On the morning of March 30, 1955, one of the owners of respondent advised libelant to go to see Dr. Richard J. Miller, an orthopedic surgeon of Tampa, who treated libelant for about two weeks and finally operated on libelant's back on April 14, 1955, removing the protruding disc. Libelant returned to work on June 15, 1955 and continued to work as mate until August, 1955, at Miami, Florida, where respondent had moved the dredge. On the latter date, respondent transferred libelant to a job as diesel engineer in order to lighten his work because of continued difficulty with his back. Libelant's back grew progressively worse until finally on November 30, 1955, he was forced to leave his employment with respondent and seek further medical attention in Tampa.

9. Since November 30, 1955, libelant about January 1956, to June, 1956 and has worked only for Jack's Cookies from for Lay's Potato Chips from about July to August, 1956, doing lighter work which he was finally forced to quit because of his back. Libelant has not worked or been able to work since September 1, 1956.

10. Dr. Mason Trupp, a qualified neuro surgeon of Tampa, Florida, and Dr. Robert C. Lonergan, an exceptionally well qualified orthopaedic surgeon of St. Petersburg, Florida, testified in this cause that the operation previously performed on libelant's back was unsuccessful, that libelant has not reached maximum medical improvement and that libelant is in need of further medical care and further surgery. Both doctors agreed that another operation called a laminectomy should be performed to explore the disc spaces in libelant's lower back, remove any protruding disc material and release any adhesions remaining from the first operation. Dr. Trupp felt that in addition to this procedure, an operation should also be done to detach the ligament that holds the spinal cord from the bottom end of the spine. Dr. Lonergan felt that libelant would gain more relief by fusing the vertebrae in the spine from which the disc material was removed. Both doctors agreed that either procedure would cost a minimum of $1,500 for doctor and hospital bills and would disable libelant for a minimum of approximately one month in the hospital and an additional period of six months following his discharge from the hospital. Respondent produced no testimony concerning libelant's present condition.

11. Libelant produced undisputed testimony that the minimum cost of room and board in Tampa, Florida, is $7.95 per day, and that the rate of maintenance being paid by all ship owners in this area is $8 per day.

12. Respondent, by its insurance carrier, paid libelant $35 per week during the period of his total disability while under treatment of Dr. Miller, and for a period of time after his discharge for permanent disability, pursuant to the Workmen's Compensation Law of the State of Florida, F.S.A. § 440.01 et seq.

The total amount of such compensation paid was stipulated to be $1,219.50. It was also agreed that respondent, by its insurance carrier, had paid all medical bills of libelant to this date. Libelant accepted the payment of workmen's compensation benefits under the Laws of Florida until December of 1955, when such payments were stopped by the insurance carrier for respondent at the time notice of this suit was served upon the respondent. No further benefits have been paid or tendered under the Workmen's Compensation Law, although further benefits would be due libelant if libelant were not subject to the Admiralty and Maritime jurisdiction herein invoked. No written agreement concerning the payment of workmen's compensation benefits has ever been made between libelant and respondent or respondent's insurance carrier.

### Discussion

Respondent urges the following contentions in defense of this action: 1) That libelant was not a seaman; 2) That General Dredge No. 1 was not engaged in navigation, and that the operation of the dredge was a matter of purely local concern over which the Admiralty Court has no jurisdiction; 3) That by the acceptance of workmen's compensation benefits, libelant is estopped from claiming maintenance and cure under the law of Admiralty; 4) That even if libelant is entitled to maintenance and cure, he may not claim maintenance or cure becoming due after the filing of his suit.

 At the time of his injury, libelant was a seaman and a member of the crew of the above vessel in navigable waters of Tampa Bay. It is well settled that a dredge employed in navigable waters is a vessel under the Maritime Law, notwithstanding the fact that it has no motive power of its own. McKie v. Diamond Marine Co., 5 Cir., 1953, 204 F.2d 132; Gahagan Construction Corp. v. Armao, 1 Cir., 1948, 165 F.2d 301. It is equally well settled that a seaman need not eat or sleep aboard the vessel on which he works or hold seaman's papers or sign ship's articles so long as his primary duties are concerned with furthering the main purpose of the vessel upon which he is employed. Early v. American Dredging Co., D.C., 101 F. Supp. 393; Summerlin v. Massman Construction Co., 4 Cir., 199 F.2d 715; Texas Co. v. Gianfala, 350 U.S. 879, 76 S.St. 141, 100 L.Ed. 775; reversing 5 Cir., 222 F.2d 382; Gahagan Construction Co. v. Armao, supra; Weiss v. Central Railroad Co. of New Jersey, 3 Cir., 235 F.2d 309; Bailey v. City of New York, D.C., 55 F.Supp. 699. The doctrine of local concern enunciated in Fuentes v. Gulf Coast Dredging Co., 5 Cir., 1931, 54 F.2d 69 and In re the Massachusetts, 5 Cir., 1928, 27 F.2d 324, 59 A.L.R. 1342, has been ignored since 1931, has never gained favor apart from the two cases above mentioned and has apparently been overruled in McKie v. Diamond Marine Co., supra and Texas Co. v. Gianfala, supra, and the cases therein cited. In any event the doctrine has no application in the present case.

 Libelant, as a seaman, is a ward of Admiralty, and as such entitled to the jealous protection of his rights by the Admiralty Court. Neither the respondent nor its insurance carrier can abrogate these rights by the voluntary payment of workmen's compensation benefits. In Kibadeaux v. Standard Dredging Co., 5 Cir., 1936, 81 F.2d 670, our Circuit Court held that the payment and acceptance of workmen's compensation benefits do not estop libelant from recovering maintenance and cure in the Admiralty Court. More recently, it was held in Gahagan Construction Corp. v. Armao, 1 Cir., 1948, 165 F.2d 301, that even an agreement to accept workmen's compensation benefits and the full performance of such agreement does not estop a seaman from receiving maintenance and cure in Admiralty, but the amount so paid merely serves as a setoff against such amounts as may be due for maintenance and cure. Certainly the improper payment, however erroneously made by a ship owner, of workmen's compensation benefits and the acceptance

thereof by a destitute seaman lying in the hospital unable to work, could not, under any circumstances, deprive the seaman of his rights in Admiralty. Respondent is entitled, at most, to a set off of the amounts paid by its insurance carrier against the amount ultimately found to be due in this action to the libelant. The seaman's recovery must be measured in each case by the reasonable costs of the maintenance and cure to which he is entitled at the time of trial, and in the discretion of the Court such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained. Calmar S.S. Corp. v. Taylor, 1938, 303 U.S. 525, 531–532, 58 S.Ct. 651, 82 L.Ed. 993.

■ Therefore, the Courts are empowered to award a decree of maintenance and cure, when justified, up to the time of the trial and for such reasonable sums as the circumstances of the case indicate to cover future treatment for a foreseeable future period of time. The "foreseeable period" contemplates such time as is evidenced by the testimony of competent medical witnesses. Moyle v. Nat'l Petroleum Transport Corp., 2 Cir., 1945, 150 F.2d 840; Cordes v. Weyerhaeuser S.S. Co., D.C.Cal.1946, 75 F.Supp. 537; Phillips v. Matson Navigation Co., D.C.Cal.1945, 62 F.Supp. 247; Godbout v. Eastern Steamship Lines, Inc., D.C.Mass.1949, 82 F.Supp. 467; Lewis v. American-Hawaiian Steamship Co., D.C.S.D.N.Y.1943, 49 F.Supp. 127.

### Conclusions of Law

1. Libelant, Richard C. Chesser, was a seaman and member of the crew of General Dredge No. 1, owned and operated by respondent, General Dredging Co., Inc., on March 29, 1955, when libelant was injured in the course of his employment.

2. General Dredge No. 1 was, at that time, a vessel engaged in dredging a channel for use in navigation in the navigable waters of Tampa Bay, Florida, within the jurisdiction of this Court.

3. Libelant has not reached maximum medical improvement from his injuries and is entitled to be paid his maintenance at the rate of $8 per day from March 29, 1955, to date during all periods when he was unemployed as a result of his condition and excluding the period of his hospitalization. Libelant is in need of additional surgery at the present time and will be unable to work for at least six months following his discharge from the hospital.

4. Respondent is entitled to a credit set off against the amounts due of those amounts heretofore paid as compensation.

5. This Court, while realizing that libelant has not reached maximum medical improvement and that libelant is in need of future medical care, and will incur future expenses for maintenance, is not going to include in its decree an amount based on an estimate of future necessity and will enter its decree for the payment of such amounts as are now due, without prejudice to libelant's right to apply to this Court in the future for the payment of additional medical expenses and future maintenance, and damages for the nonpayment of same, in the event such expenses are necessarily incurred and the respondent refuses to pay the same.

6. Libelant was unable to work for 5 days immediately following his injury and for 49 days following his first operation and, excluding libelant's time off work following November 30, 1955, until he went to work for Jack's Cookies, for which libelant offered no specific proof, libelant has been unable to work from September 1, 1956, to the date of this decree, a period of 226 days, making a total amount due for past maintenance for 280 days of a total of $2,240, less $1,219.-50, the amount already paid, or a total due of $1,020.50.

Therefore, let judgment enter for libelant in the amount of $1,020.50, with interest from this date and costs.