Jethro BARRETT, Plaintiff,

v.

CHEVRON, U.S.A., INC., E.B.B. Co.,
Inc. and Lift Barge, Inc., et al.,
Defendants-Appellees,

v.

MARYLAND CASUALTY COMPANY,
Intervenor-Appellant.

No. 82–3693.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1986.

Frederick R. Bott, Eileen R. Madrid, New Orleans, La., for Maryland Cas.

Harvey J. Lewis, New Orleans, La., for amicus—La. Trial Lawyers Ass'n.

Wood Brown, III, New Orleans, La., for amicus—La., Ass'n of Defense Counsel.

Kenneth G. Engerrand, Houston, Tex., Neutral amicus—Kenneth G. Engerrand.

E. Alfred Smith, Thomas E. Byrne, Jr., Philadelphia, Pa., for amicus—Travelers.

Thomas J. Grace, Charles V. Guilbault, New Orleans, La., for Life Barge, et al.

Paul W. Wright, Gene S. Palmisano, James K. Irvin, Bruce R. Hoefer, Jr., New Orleans, La., for amicus—EXXON.

David W. Robertson, Austin, Tex., for amicus—David W. Robertson.

Richard A. Cozad, Michael L. McAlpine, New Orleans, La., for E.E.B. Co., Inc.

Lloyd C. Melancon, New Orleans, La., for Chevron U.S.A.

Robert N. Habans, Jr., New Orleans, La., for Admiral Ins.

Joseph W. Rausch, New Orleans, La., for third-party Tilden Ell.

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This case brings before the en banc court a question frequently confronted in this circuit: when is an offshore oilfield worker a "seaman" for purposes of the Jones Act?[1] We take the opportunity for en banc consideration of whether, after twenty-six years of development and interpretation, the test for Jones Act seaman status enunciated in *Offshore Company v. Robison,* 266 F.2d 769 (5th Cir.1959) should be modified.

The panel opinion, 752 F.2d 129, recites these facts to which we add only the material in brackets:

## I.

### FACTS

In 1979, Tilden J. Elliott Contractor, Inc. ("Tilden") contracted with Chevron, U.S.A., Inc. to provide welding crews for maintenance and repair work to offshore platforms and other structures in Chevron's Bay Marchand Field located in the Gulf of Mexico off the coast of Louisiana. Plaintiff, Barrett, was an employee of Tilden who performed services as a welder's helper under the contract between Tilden and Chevron. [Barrett had worked in the Bay Marchand Field for approximately one year before the accident. Plaintiff and his welding crew worked fourteen days on and seven days off. They were dispatched to different platforms in the field and ordinarily continued working on those platforms until the repairs and renovations were completed. Most of the platforms were large enough to permit the welding crew to perform their assigned work on the platform without the aid of a standby vessel. According to Mr. Barrett's testimony, seventy to eighty percent of his work was performed on such platforms where no auxiliary vessel was needed.] On one particular assignment, Tilden was

---

1. The Merchant Marine Act of 1920, popularly known as the Jones Act after Senator Wesley L. Jones of Washington, then Chairman of the Senate Commerce Committee, provides:

   Any *seaman* who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

   46 U.S.C. § 688 (emphasis added).

to perform welding services on a caisson located approximately ten to twelve miles offshore. The caisson was a small fixed structure, measuring only ten by fifteen feet, comprised basically of one producing well which was tied into the underwater pipeline system in the field. Barrett was a member of the Tilden welding crew assigned to perform welding operations on the caisson.

Because of the small size of the caisson, a jack-up barge, the D/B FALCON, was positioned alongside the caisson in order to provide space on which the necessary equipment and materials for the Tilden crew could be placed and to provide a work area for the crew. The D/B FALCON was the only barge assigned to the Chevron Bay Marchand Field. The vessel would remain stationary at one job site until an assignment was completed, and then move on to the next site.

The Tilden crew was assigned to the caisson to remove old parts and to fabricate and attach new parts. The only work performed on the caisson itself was the cutting of the old pipe from the caisson and replacing it with the new pipe. The old parts, after removal, were brought by one of the D/B FALCON's two cranes back to the D/B FALCON where they were measured and new pipes were fabricated. Barrett spent seventy to eighty percent of his time on the D/B FALCON assisting in the measuring and fabricating of new pipe sections.

During the fourteen-day offshore hitch, the Tilden crews were provided living quarters on a large fixed platform called Mike's Structure. Each morning, the crew boat M/V LADY JUNE, owned and operated by E.B.B. Company, transported the crew members from Mike's Structure to their respective work sites. Crew members ate lunch at the job site and at the end of each day's shift, were transported back to Mike's Structure to eat and sleep.

On the morning of May 23, 1979, Barrett, along with the rest of the Tilden crew, was transported by the crew boat M/V LADY JUNE to the caisson under repair. Crew members were transferred from the M/V LADY JUNE to the D/B FALCON by means of a personnel basket. The basket was lifted by a crane located on the D/B FALCON. While being transferred from the M/V LADY JUNE to the D/B FALCON in the personnel basket, Barrett injured his back. Despite this injury, Barrett continued to perform his duties and returned to the D/B FALCON the following day to perform his usual assignments. On that day, while assisting a co-worker in lifting a heavy piece of pipe, Barrett suffered further injury to his back and was taken from the offshore work site to seek medical care. This second injury or aggravation was sustained while Barrett was aboard the D/B FALCON.

Barrett brought a personal injury action originally against Chevron, owner of the production platform, E.B.B. Company, Inc., owner and operator of the M/V LADY JUNE, and Lift Barge, Inc., owner and operator of the D/B FALCON. Barrett alleged that the D/B FALCON crane operator, an employee of Lift Barge, caused the personnel basket to strike the deck of the M/V LADY JUNE with greater than usual force resulting in injury to Barrett. Barrett claimed that his injury was subsequently aggravated by lifting the pipe on board the D/B FALCON. Barrett and his wife then filed a second suit for the aggravation of the injury against Tilden and Lift Barge. Plaintiffs sought damages under the Jones Act and general maritime law for negligence and unseaworthiness, and maintenance and cure. The two actions were eventually consolidated.

752 F.2d at 131–32 (footnotes omitted).

In a non-jury trial, the district court found that Barrett was a Jones Act seaman. On these facts, the majority of the panel agreed with the district court.

## II.

### BACKGROUND

The historical background of the question that we address today is one that has

been related many times in many places. Yet for the sake of clarity, we set it forth once again.

The Jones Act grants its liberal remedies to "any seaman." This term is not defined in the Act, and in the years immediately following the passage of the Jones Act it was given an expansive interpretation by the Supreme Court. In *International Stevedoring Co. v. Haverty*, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926), the Supreme Court held that "seaman" included longshoremen when they were employed in maritime work on navigable waters. 272 U.S. at 52, 47 S.Ct. at 19. The next year Congress passed the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901, et seq. (LHWCA), which provides a compensation remedy for all maritime workers injured on navigable waters, except those employees who are "a master or member of a crew of any vessel." 33 U.S.C. § 902(3)(G). Thus, the coverage of the Jones Act is narrowed by the LHWCA. The LHWCA limits the broad term "seamen" so that only "member[s] of a crew of a vessel" are exempted and permitted to be covered by the Jones Act.[2] Just what the term "member of a crew of a vessel" signifies, however, is a question with which the Supreme Court grappled from 1940 until 1958, and which has concerned the circuit courts ever since.

The first real attempt by the Supreme Court to define the term "member of a crew" in order to determine the scope of the Jones Act was *South Chicago Coal & Dock Co. v. Bassett*, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732 (1940), a suit for the death of an employee who had worked on a lighter used for fueling steamships. The decedent's primary job was to facilitate the passage of coal from the lighter to the steamship. On occasion he threw lines and cleaned the lighter. The court observed that whether an individual is a member of a crew is a question to be left to the trier of fact, and concluded that "[t]he word 'crew' does not have an absolutely unvarying le-

gal significance." *Id.* at 258, 60 S.Ct. at 548. The court went on to state:

> [The LHWCA] as we have seen, was to provide compensation for a class of employees at work on a vessel in navigable waters who, although they might be classed as seamen [citing *International Stevedoring Co. v. Haverty*] were still regarded as distinct from members of a "crew." They were persons serving on vessels, to be sure, but their service was that of laborers, of the sort performed by longshoremen and harbor workers and thus distinguished from those employees on the vessel who are naturally and primarily on board to aid in her navigation.

309 U.S. at 260, 60 S.Ct. at 549. Since the employee's duties had little to do with navigation, the Supreme Court concluded that he was not a member of the crew and thus was covered by the LHWCA. This restrictive approach to the seaman-status question was to be relaxed by later cases.

The next case to consider the status question was *Norton v. Warner Co.*, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944). The trial court found a bargeman who lived aboard the barge, and whose duties included pumping, tying and untying lines, putting out navigational lights, and assisting while the barge was in tow to be a harborworker, not a member of the crew. The Court of Appeals reversed, and the Supreme Court affirmed the reversal. In reaching this decision, the Court repeated the *Bassett* statement that the term "crew" embraces individuals who are naturally and primarily on board the vessel to aid in her navigation, but went on to explain that:

> [N]avigation is not limited to "putting over the helm." It also embraces duties essential for other purposes of the vessel. Certainly members of the crew are not confined to those who can "hand, reef and steer." Judge Hough pointed out in the Buena Ventura that "everyone is entitled to the privilege of a seaman who, like seamen, at all times contribute

---

**2.** *See, e.g., Swanson v. Marra Brothers Inc.,* 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045, (1946); *Ber-* *trand v. International Mooring & Marine, Inc.,* 700 F.2d 240, 243 (5th Cir.1983).

to and labor about the operation and welfare of the ship when she is upon a voyage." We think that "crew" must have at least as broad a meaning under the Act.

321 U.S. at 572, 64 S.Ct. at 751 (footnotes and citations omitted). Of particular significance for our discussion today is one of the final lines of this opinion, which states, "[Plaintiff] moreover had that permanent attachment to the vessel which commonly characterizes a crew." *Id.* at 573, 64 S.Ct. at 751.

The next case of significance for our analysis is *Gianfala v. Texas Company*, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955), an action for death of a worker assigned to a submersible drilling barge who was killed while helping to unload pipe from an adjacent cargo barge. The testimony concerning the employee's duties was undisputed. A jury found the employee to be a crew member, and the district court entered a judgment on the verdict in plaintiff's favor. This circuit reversed, concluding that, on undisputed facts, the status question was one of law to be resolved by the judge. *Texas Company v. Gianfala*, 222 F.2d 382, 386 (5th Cir.1955). We concluded that the drilling barge was not in navigation and that the decedent was on board as a member of a *drilling crew*, not as a member of a *ship's crew*. *Id.* at 387. The Supreme Court disagreed with our conclusion and, without explanation, reversed and remanded with directions for the district court to reinstate its judgment. 350 U.S. at 879.

Next came *Senko v. La Crosse Dredging Corp.*, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404, (1957) in which the plaintiff was hired to splice rope, stow supplies, and in general clean and maintain an anchored dredge barge. An Illinois state court jury found that the plaintiff was a seaman; an Illinois appellate court reversed this finding holding that there was insufficient evidence from which to find the plaintiff to be a crew member. The Supreme Court granted certiorari and reversed, stating that on these facts it was a reasonable inference

that the plaintiff was responsible for the barge's seaworthiness. 352 U.S. at 372–73, 77 S.Ct. at 416–17. More significantly, the court stated: "Our holding [in *South Chicago Coal & Dock Co. v. Bassett* ] that the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact meant that juries have the same discretion they have in finding negligence or any other fact." 352 U.S. at 374. Since the plaintiff performed almost all of his duties on or on behalf of the dredge, the Supreme Court considered him to be "permanently attached to and employed by the dredge as a member of its crew." *Id.* at 372, 77 S.Ct. at 417. This meant that there was sufficient evidence to support a jury finding of crew member status.

Two brief per curiam opinions ended the Supreme Court's consideration of the crew member status issue. The first of these, *Grimes v. Raymond Concrete Pile Co.*, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958), involved a piledriver who assisted in the completion of a "Texas tower," a radar relay installation similar to a fixed drilling platform, while it was being constructed in a shipyard. Grimes lived on the tower and kept its equipment in operating condition while it was being towed out to its location at sea. After the tower reached its location and was anchored, the plaintiff Grimes performed only piledriving duties. Six days later, he was injured while returning from a trip from a nearby barge to the tower. Grimes contended that he was a member of the crew of the barge, the Texas tower, or both. The court of appeals held that Grimes was not a crew member as a matter of law; the Supreme Court reversed without explanation, citing *Senko*, *Gianfala*, and *Bassett* for the proposition that there was sufficient evidence to send the status issue to the jury. In the second case, *Butler v. Whiteman*, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958), the decedent performed odd jobs for the defendant around the defendant's wharf, barge and tug, all of which were on the Mississippi River. The tug had been out of navigation for some months before the decedent's

death, and immediately before his accident the decedent had apparently been readying the tug for inspection and return to river service. The day of the accident he had been cleaning its boilers. The Supreme Court again held, without explanation, that whether the decedent was a Jones Act crew member was a jury question. 356 U.S. at 271, 78 S.Ct. at 735. With this 1958 decision the Supreme Court ended, for all practical purposes, its consideration of the Jones Act status issue.[3]

Prior to 1958 this circuit had utilized a test originated by the first circuit in *Carumbo v. Cape Cod S.S. Co.*, 123 F.2d 991 (1st Cir.1941), and adopted in *McKie v. Diamond Marine Co.*, 204 F.2d 132 (5th Cir.1953): "The essential and decisive elements of the definition of a 'member of a crew' [are] that the ship be in navigation; that there be a more or less permanent connection with the ship; and that the worker be aboard primarily to aid in navigation." 204 F.2d at 136. By 1959, however, the intervening Supreme Court decisions in *Gianfala*, *Grimes* and *Butler* called for a reevaluation of this test, and this our court undertook in *Offshore Company v. Robison*. Robison was a roughneck permanently assigned to a drilling rig mounted on a barge in the Gulf of Mexico. He was injured while attempting to escape from a runaway section of casing. 266 F.2d 771–72. Robison sued his employer, contending that he was a member of the crew of the barge on which he was injured. A jury agreed with these contentions. *Id.* at 773 n. 4. On appeal, the panel, speaking through Judge Wisdom, surveyed the Supreme Court cases and other jurisprudence, and concluded:

> [T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float

on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

266 F.2d at 779. This test does not include the "aid-to-navigation" language which appeared in the *McKie* test and the early Supreme Court decisions. Explaining the omission, the opinion stated:

> Our review of the cases shows this test has been watered down until the words have lost their natural meaning.... we attach less importance to either of these catchphrases than we do to the cases piled on cases in which recovery is allowed when by no stretch of the imagination can it be said that the claimant had anything to do with navigation and is a member of the ship's company only in the sense that his duties have a connection with the mission or the function of the floatable structure where he was injured.

*Id.* at 780. *Robison* also emphasized that the Supreme Court cases outlined above had already made clear that the status determination was, like any other factual determination, generally to be entrusted to the jury:

> [The terms "seaman," "vessel," and "member of a crew"] have such a wide range of meaning under the Jones Act as interpreted in the courts, that, except in rare cases, only a jury or trier of facts can determine their application in the circumstances of a particular case. Even where the facts are largely undisputed, the question at issue is not solely a question of law when, because of conflicting inferences that may lead to different conclusions among reasonable men, a trial

---

**3.** Two later cases, *Braen v. Pfeifer Oil Transportation Co., Inc.*, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191 (1959) and *Tipton v. Socony Mobil Oil Co., Inc.*, 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4, (1963) involve the status issue, but do not discuss what makes an individual a member of a crew.

judge cannot state an unvarying rule of law that fits the facts.

266 F.2d at 779–80 (footnotes omitted).

*Robison* distilled a test from the existing meager Supreme Court authority on the subject and the Supreme Court has not directly addressed the issue since.[4] For over twenty-five years, since 1959, the *Robison* test has stood in this circuit as the test for whether the status question should go to the jury, and also for the corollary question, whether the evidence of crew member status is sufficient to support a jury verdict. It has been cited more than ninety-five times, relied on in innumerable other unpublished circuit and district court opinions, and considered a lighthouse by both plaintiffs' and defendants' counsel in compromise negotiations.

The many circuit and district court opinions have, however, inevitably emphasized different portions of the *Robison* test, and, in the course of doing so have created some inconsistencies. Very few of these have involved the second major prong of the *Robison* test, whether the employee contributed to the function of the vessel or to the accomplishment of its mission. This aspect of the test is by its nature easily ascertained—for example, Robison's duties aboard the seagoing drilling platform clearly contributed to the function that it was designed to serve—drilling for oil.

Some of our amici suggest that *Robison* erred in eliminating the "aid-to-navigation" requirement which appears in the early Supreme Court cases. Others suggest that the second prong of the *Robison* test

should be reformed to grant crew member status only to those workers who perform significant navigational functions or further the "transportation function" of the vessel. This is essentially the approach adopted by the Seventh Circuit in *Johnson v. John F. Beasley Construction Co.*, 742 F.2d 1054 (7th Cir.1984).

We cannot accept either of these suggestions, because as Judge Wisdom cogently and convincingly explained in *Robison*, the later Supreme Court cases require such a broad definition of "aid to navigation" that the test proposed by amici is entirely inconsistent with them.

This leaves for our consideration the first portion of the *Robison* test—whether the employee was assigned permanently to a vessel or performed a substantial part of his work on the vessel. *Robison* requires evidence that the worker was "assigned permanently to ... or performed a substantial portion of his work on the vessel." This test is, of course, disjunctive, and permits a worker to be a crew member if he does substantial work on the vessel even though his assignment to it is not "permanent."[5]

This circuit has given the term "permanent," which we have used since 1958,[6] an extensive judicial gloss. We have said that, in order to prove "substantial work" equivalent to permanent assignment "it must be shown that [the claimant] performed a significant part of his work aboard the vessel with at least some degree

---

**4.** The Supreme Court in *Herb's Welding, Inc. v. Gray,* 470 U.S. ——, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985) considered whether workers engaged in oil production activities in coastal waters aboard stationary platforms were engaged in "maritime employment" and thus covered under the LHWCA. In its discussion of the status of oilfield workers, the Court noted:

"Floating structures have been treated as vessels by the lower courts. E.g., *Producers Drilling Co. v. Gray,* 361 F.2d 432, 437 (C.A.5 1966). Workers on them, unlike workers on fixed platforms, *see Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 23 L.Ed.2d 360, 89 S.Ct. 1835 (1969), enjoy the same remedies as workers on ships. If permanently attached

to the vessel as crewmembers, they are regarded as seamen; if not, they are covered by the LHWCA because they are employed on navigable waters."

*Id.* at ——, n. 2, 105 S.Ct. at 1424, n. 2, 84 L.Ed.2d 410, n. 2.

**5.** *See, e.g., Davis v. Hill Engineering, Inc.,* 549 F.2d 314, 326 (5th Cir.1977).

**6.** *See Norton v. Warner Co.,* 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944); *McKie v. Diamond Marine Co.,* 204 F.2d 132 (5th Cir.1953); *Maryland Casualty Co. v. Lawsen,* 94 F.2d 190, 192 (5th Cir.1938); *Carumbo v. Cape Cod S.S. Co.,* 123 F.2d 991 (1st Cir.1941).

of regularity and continuity."[7] We have also described the necessary relationship as one "evincing a vessel relationship that is substantial in point and time and not merely spasmodic."[8] In perhaps the broadest description we have said, "[T]he permanency requirement is, we think best understood as indicating that in order to be deemed a 'seaman' within the meaning of the Jones Act 'a claimant [must] have more than a transitory connection' with a vessel or a specific group of vessels."[9]

These varying formulations reflect the principle that the permanent-attachment aspect of the crew member status determination, like the status determination as a whole, is an inherently factual question, and, as our cases since *Robison* make clear, it is generally a question for the fact-finder. Our cases also make clear, however, that status may be determined by summary judgment in the appropriate situation. Thus, we have held that "where the facts establish *beyond question as a matter of law* [the lack of seaman status] ... a court ... may, in the proper case, hold that there is no reasonable evidentiary basis to support a jury finding that the injured person is a seaman ... under the Jones Act."[10] Similarly, when the evidence can lead only to the conclusion that the injured person was a crew member, summary judgment declaring his status is proper.[11]

■ In most cases the facts and inferences to be drawn from them may lead to either decision by the factfinder, for the *Robison* test is inherently factual, and, like

all applications of a legal standard to widely-varying factual situations, may inevitably result in some inconsistent determination of status. The Supreme Court, which *Robison* followed, accepts these inconsistencies. The Supreme Court has signalled no disapproval of *Robison* and we continue to follow it.

### III.

■ In this case, we consider the duration of the employee's assignment necessary to support submission to a jury of the question whether he performed a substantial portion of his duties aboard a vessel or fleet of vessels. By fleet we mean an identifiable group of vessels acting together or under one control.[12] We reject the notion that fleet of vessels in this context means any group of vessels an employee happens to work aboard. Unless fleet is given its ordinary meaning, the fundamental distinction between members of a crew and transitory maritime workers such as longshoremen is totally obliterated.

During the year Barrett worked as a welder's helper in Chevron's Bay Marchand Field, he spent as much as twenty to thirty percent of his time working aboard vessels. During the fourteen-day hitch in which he suffered his injury, Barrett was assigned for the eight days immediately preceding the injury to work from the D/B FALCON, renovating equipment on the small caisson. In this eight-day period, he spent as much as seventy percent of his work time aboard the FALCON. If Barrett was entitled to

---

7. See, e.g., *Barrios v. Engine & Gas Compressor Services, Inc.*, 669 F.2d 350, 353 (5th Cir.1982); *Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 484 (5th Cir.1976).

8. See, e.g., *Bertrand v. International Mooring & Marine, Inc.*, 700 F.2d at 247; *Guidry v. Continental Oil Co.*, 640 F.2d 523, 529 (5th Cir.), *cert. denied*, 454 U.S. 818, 102 S.Ct. 96, 70 L.Ed.2d 87 (1981); *Rotolo v. Halliburton Co.*, 317 F.2d 9, 13 (5th Cir.), *cert. denied*, 375 U.S. 852, 84 S.Ct. 111, 11 L.Ed.2d 79 (1963).

9. *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 281 (5th Cir.1981) (quoting *Davis v. Hill Engineering*, 549 F.2d at 326). *See also Bertrand v. International Mooring & Marine, Inc.*, 700 F.2d at 247.

10. *Guidry v. Continental Oil Co.*, 640 F.2d 523, 529 (5th Cir.1981) *(emphasis added); see also Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1346 (5th Cir.1980); *Bouvier v. Krenz*, 702 F.2d 89 (5th Cir.1983); *White v. Valley Line Co.*, 736 F.2d 304 (5th Cir.1984).

11. *See Coulter v. Texaco, Inc.*, 714 F.2d 467, 468 (5th Cir.1983); *Producers Drilling Co. v. Gray*, 361 F.2d 432, 436 (5th Cir.1966).

12. Webster's New World Dictionary 533 (2d College ed. 1979); *See* Engerrand & Bale, *Seaman Status Reconsidered*, 24 S.Tex.L.J. 431, 490–91 (1983).

have his status decided on the basis of his work during the eight days immediately before his accident, the district court might properly have concluded that he was a member of the crew of a vessel or, indeed, as we have already indicated, that he was not. On the other hand, if the district court was required to consider Barrett's vessel-related work during his entire one-year assignment as a welder's helper to Chevron's Bay Marchand Field, the record does not support a finding that he was a crewmember.

We considered a similar question in *Longmire v. Sea Drilling Corp.,* 610 F.2d 1342 (5th Cir.1980). Longmire was employed as a floor hand and, for three hitches of seven days each, was assigned to an offshore drilling platform. The plaintiff and his fellow workers ate and slept aboard a tender vessel anchored next to the platform. Longmire had spent the first two hitches working almost exclusively aboard the platform. When he started the third hitch, however, the drilling rig was being dismantled for movement to another location and Longmire was assigned to work aboard the tender. The entire day before his injury he stowed anchor chains on the tender. The district court granted summary judgment holding that Longmire was not a member of the crew of the tender. We affirmed in language that is applicable here:

> It can hardly be said that Longmire's incidental activities aboard the tender—maintenance, moving supplies to and from the drilling platform, and stowing the anchor chain—were sufficient, when viewed in the context of his entire employment as a member of the drilling crew, to amount to performance of "a significant part of his work aboard the ship with ... some degree of regularity and continuity."

*Id.* at 1347.

We expanded on this statement in a footnote:

> When seaman's status is sought on the theory that the claimant has performed a substantial part of his work on the vessel, however, the circumstances of the claimant's injury cannot be viewed in isolation but must be considered in relation to his other regular duties. We do not preclude the possibility that an informal and temporary change of duties, though not tantamount to permanent assignment to a vessel, may be sufficient to effect an immediate change in the worker's status to that of a seaman if the change of duties involves work that would normally be done by a member of a ship's crew and it can reasonably be said that, taking into consideration all the circumstances of his employment, the change involves a regular and continuous, rather than intermittent, commitment of the worker's labor to the "function of the vessel, its mission, its operation, or its welfare." *Cf. Beard v. Shell Oil Co.,* 606 F.2d 515 at 517 (5th Cir.1979). What is to be avoided is engrafting upon the statutory classification of a "seaman" a judicial gloss so protean, elusive, or arbitrary as to permit a worker to walk into and out of coverage in the course of his regular duties.

*Longmire,* 610 F.2d at 1347, n. 6.

Thus, if the employee's regularly assigned duties require him to divide his time between vessel and land (or platform) his status as a crew member is determined "in the context of his entire employment" with his current employer.[13] *Id.* at 1347. This is not an inflexible requirement, however, and does not preclude assessment of the extent of the employee's work aboard a vessel over a shorter time period if the employee's permanent job assignment during his term of employment has changed. If the plaintiff receives a new work assignment before his accident in which either his

---

**13.** We do not decide whether the same principle governs the crewmember status of the maritime worker who spends virtually all of his time performing traditional seaman's duties—work closely related to the movement of vessels—but does his work on short voyages aboard a large number of vessels. *See Bertrand v. International Mooring & Marine, Inc.,* 700 F.2d 240 (5th Cir.1983). Bertrand and his fellow anchor handlers are good examples of this type worker.

essential duties or his work location is permanently changed, he is entitled to have the assessment of the substantiality of his vessel-related work made on the basis of his activities in his new job.

■■■■ Applying these principles, we conclude that the district court erred in concluding that Barrett was a member of the crew of the Barge *FALCON.* Whether Barrett was a crew member should have been determined in the context of his entire employment as a welder's helper with Tilden J. Elliott Contractor, Inc. The record reveals that Barrett's employment duties as a welder's helper in Chevron's Bay Marchand Field did not significantly change during the term of his employment. Thus, consideration of Barrett's vessel-related duties during a period shorter than the entire term of his employment with Elliott is unwarranted. Accepting Barrett's testimony as true, during his one-year employment for Elliott he performed seventy to eighty percent of his work on platforms and no more than twenty to thirty percent of his work on vessels. Because he did not perform a substantial portion of his work aboard a vessel or fleet of vessels, he failed to establish that he was a member of the crew of a vessel.

REVERSED and RENDERED.

GEE, Circuit Judge, with whom E. GRADY JOLLY, ROBERT MADDEN HILL, and EDITH HOLLAN JONES, Circuit Judges join, specially concurring:

I concur in the judgment of the Court. In addition, and in order that there can be a rule on the question in our Circuit, I concur in the majority opinion.

Were I free to do so, however, I would adopt for our Circuit the rule of *Johnson v. John F. Beasley Construction Co.,* 742 F.2d 1054 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985). I would do so for the reasons there well stated by Judge Wood, the author of that opinion. In particular, with the advent of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(b), and the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.,* the reasons which drove our Circuit's broad construction of the Jones Act's undefined term "seamen" have largely vanish·d. See *Offshore Co. v. Robison,* 266 F.2d 769, 780 (5th Cir.1959) (other workers in "many instances ... are exposed to more hazards than are blue-water sailors.")

So long as Jones Act benefits are more attractive than those of the other marine compensation schemes, astute counsel will seek to qualify their clients as "seamen." A bright-line rule is called for, one that nudges coverage back toward the blue-water sailors for whom the Jones Act was meant. The *Johnson* test is such a rule; I would adopt it if I could. But because it is more important to have a rule than to have the correct one, I concur.

ALVIN B. RUBIN, Circuit Judge, with whom REAVLEY, POLITZ, TATE, JOHNSON and JERRE S. WILLIAMS, Circuit Judges join, dissenting from Part III of the opinion and the judgment of the Court:

The majority refused to determine an injured worker's status as a crew member on the basis of what he was doing when he was injured, but insists that his status must be decided on the basis of what he did in the past, and holds in effect that, unless the worker's "permanent job assignment" has changed, his duties and status at the time he is injured are irrelevant. In doing so it makes a profound change in the rights of offshore maritime workers who are injured when assigned to a vessel and exposed to the perils of the sea, and who are in every real sense crew members. I, therefore, dissent from Part III of the majority opinion.

The LHWCA repudiated *Haverty* and constricted Jones Act coverage: since its passage a worker is no longer a crew member simply because he is doing a seaman's work at the moment of his injury. The *Robison* test conforms to that command; it requires the fact finder to distinguish between a worker who performs a substantial

part of his work on a vessel and a worker who, even though he is doing tasks normally done by a crew member, has only a transitory connection with a vessel. Connection with a vessel is, of course, essential to crew-member status, no matter what the nature of the worker's duties, and the connection must either be permanent or sufficiently close and continued to warrant the conclusion that he is not merely doing work that the crew would do but is himself a member of the crew.

In the case of offshore workers who customarily work hitches of definite but limited duration, such as seven or fourteen days, the fact finder must, of course, consider the totality of the worker's duties during the entire term of his employment, but this should not be dispositive. If the worker's duties have been changed during the course of his employment, the nature of his duties during the hitch on which he was injured is also important in determining whether he was at that time a crew member or simply a worker doing occasional maritime duties. To qualify as a crew member for the hitch during which he was injured, the worker must show that his vessel-related activities required performance of his work aboard ship with "... some degree of regularity and continuity,"[1] and that the change in his duties involved "a regular and continuous, rather than intermittent, commitment of the worker's labor to the 'function of the vessel, its mission, its operation, or its welfare.' "[2] It suffices, however, that he show such an assignment for an entire period of work. The majority's requirement that such a change reflect a "permanent" change in job assignment is inflexible and contrary to the rationale underlying *Robison*.

The status of maritime workers, other than offshore workers scheduled for periodic hitches, should be decided in like manner. The assignment of a worker who is not usually a crew member may be changed, and he may be ordered by his employer to work aboard a vessel for a period of limited duration. His status as a crew member, vel non, should be determined by considering the transitory duration or fixed term of the assignment, the nature of his duties during it, and the relationship of those duties to the mission of the vessel. Thus a fact finder might find that an anchor handler who is assigned to work on a specific vessel for a period of days is a crew member during that assignment. A worker may also be assigned to work as a crew member for a series of voyages of limited duration. A fact finder might, therefore, find that a person working as a pilot on a series of short voyages is a crew member on one or more voyages. An assignment to work as a crew member, like the voyage of a vessel, may be brief, and the *Robison* test is applicable in deciding the worker's status during any such employment.

As an example, if a cook employed in a cafeteria on shore were assigned by his employer to a ship's galley for a voyage of one or two weeks duration, he might be held to be a crew member during this voyage; if the same cook were sent aboard the vessel while it was in port to prepare one meal during the absence of the regular cook, the facts might not warrant the conclusion that his status had changed. The fact that an employee may have had some seaman's duties during the hitch in which he was injured would not suffice to make him a crew member unless it represented both a change in his duties and an assignment to a vessel sufficient to satisfy *Robison*'s test.

Determination of status on the basis of the work assignment at the time of injury might, but would not necessarily, result in a different conclusion in cases like *Longmire v. Sea Drilling Corp.*, but the decision in such cases should be made by the trier of fact, not by the summary judgment

---

**1.** *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1346 (5th Cir.1980) (quoting *Keener v. Transworld Drilling Co.*, 468 F.2d 729, 732 (5th Cir. 1972)).

**2.** *Longmire*, 610 F.2d at 1347 n. 6 (quoting *Beard v. Shell Oil Co.*, 606 F.2d 515, 517 (5th Cir. 1979)).

there rendered.[3] Longmire was employed as a floorhand on an offshore drilling platform. He worked seven-day hitches and was off duty for seven days between each hitch. During his first two hitches, he worked almost exclusively aboard the platform. When he started his third hitch, however, the drilling rig was being dismantled for movement to another location and Longmire was assigned to stow equipment aboard a tender vessel. On the day he was injured, Longmire had spent his entire shift stowing anchor chains on the tender and was injured as he finished work. The fact finder might have concluded that Longmire was a platform worker transitorily assigned to a vessel, but there was sufficient evidence to warrant a different verdict, hence submission of the issue to the jury as a question of fact.

Seaman status is generally a question for the jury and should be left for the jury's determination even when the claim to seaman status appears relatively marginal.[4] Status should be decided as a question of fact and not by summary judgment unless there is no genuine dispute of material fact, and the uncontroverted facts inescapably determine status as a matter of law.

During the year Barrett worked as a welder's helper in Chevron's Bay Marchand Field, he spent twenty to thirty percent of his time working aboard vessels. However, during the hitch on which he was injured, he had been assigned continuously for the eight days preceding his injury to work from the D/B FALCON, renovating equipment on the small caisson. During this hitch, he spent as much as seventy percent of his work time aboard the vessel. If Barrett's status is determined solely on the basis of his work assignments over the one-year period, he was not a crew member because he was not attached to a vessel or fleet of vessels during that period save for intermittent intervals. The fact finder, whether judge or jury, should, however, have considered in addition whether Barrett's assignment during the fourteen-day hitch he was working when he was injured represented a change in the nature of his job, or whether it was an assignment of a transitory, impermanent nature during which his work aboard the vessel was incidental to primarily land-related duties.

The majority opinion correctly sums up the decision of the Supreme Court in *Gianfala v. Texas Company,*[5] *Senko v. La Crosse Dredging Corp.,*[6] *Grimes v. Raymond Concrete Pile Co.,*[7] and *Butler v. Whiteman.*[8] As all of these cases held, the status question is for the jury and status is determined by the worker's assignment when he is injured, not by the general characterization of his work.

Because the question of crew-member status is a mixed question of law and fact,[9] and because this case was tried to the court, the findings of the district court concerning Barrett's status must be respected unless they are clearly erroneous.[10] Although the district court did not apply the test I have suggested in this dissent, it would have reached the same result had it done so and the district court was not clearly erroneous in finding that Barrett

3. 610 F.2d 1342 (5th Cir.1980).

4. *See Prinzi v. Keydril Co.,* 738 F.2d 707, 708–09 (5th Cir.1984) and cases cited therein. *See also Abshire v. Seacoast Products, Inc.,* 668 F.2d 832, 837 (5th Cir.1982); *Senko v. La Crosse Dredging Corp.,* 352 U.S. 370, 374, 77 S.Ct. 415, 417, 1 L.Ed.2d 404, 408 (1957).

5. 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed.2d 775 (1955).

6. 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957).

7. 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958).

8. 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958).

9. *Hall v. Diamond M Co.,* 732 F.2d 1246, 1248 (5th Cir.1984).

10. Fed.R.Civ.P. 52(a). *See McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7–8, 99 L.Ed. 20, 24 (1954); *Dardar v. Louisiana State Dep't of Highways,* 447 F.2d 952, 953 (5th Cir.1971), *cert. denied,* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972).

was a crew member. I would, therefore, affirm.