868 So.2d 732 (2003)
John R. SEIVERS and Juanita L. Seivers[1]
v.
EPOCH WELL LOGGING, INC., Baroid Drilling Fluids, Inc., Spirit Energy 76 Inc., R & B Falcon Drilling USA, Inc., a/k/a Falcon Inland, Inc., a/k/a R & R Falcon Inland, Inc.
No. 2003 CA 0282.
Court of Appeal of Louisiana, First Circuit.
December 31, 2003.
*733 Daria Burgess Diaz, Robert S. Abdalian, New Orleans, Counsel for Plaintiffs/Appellants John R. Sievers and Juanita L. Sievers.
Brett M. Bollinger, Alan A. Zaunbrecher, Metairie, Counsel for Defendant/Appellee Epoch Well Logging, Inc.
Before: WHIPPLE, KUHN, and MCDONALD, JJ.
KUHN, J.
Plaintiffs-appellants, John R. Sievers and his wife, Juanita, appeal the dismissal by summary judgment of their action for Jones Act (46 U.S.C.App. § 688) damages against employer, defendant-appellee, Epoch Well Logging, Inc. (Epoch), based on the trial court's conclusion that John Sievers (John) lacked the requisite seaman status necessary to recover under this federal compensation scheme. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND
After John sustained personal injuries while assigned to an oil-drilling job working aboard the vessel Falcon # 32, the Sievers, in May 1999, filed this petition for damages averring entitlement to damages under the Jones Act, and/or the Longshoremen and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950, and/or Louisiana law. Among the defendants named in the Sievers' petition was Epoch, who employed John; Spirit Energy 76, Inc./Unocal (Unocal),[2] the company for whom the Sievers alleged the oil-drilling job was performed; and R & B Falcon Drilling USA, Inc. (Falcon), averred to be the owner/operator of Falcon # 32.
In March 2001, Unocal and Falcon collectively filed a motion for summary judgment asserting numerous bases for dismissal of the Sievers' claims against each *734 defendant. After a hearing on August 17, 2001, the trial court concluded that John was "not a Jones Act seaman" and granted a partial summary judgment in favor of Unocal and Falcon. And in a judgment signed on October 2, 2001, the Sievers' "claims arising under the Jones Act" asserted against Unocal and Falcon were dismissed. No appeal from this judgment was taken by the Sievers.
Subsequent to the August 17, 2001 hearing, Epoch filed a motion for summary judgment wherein it noted the trial court's earlier determination in favor of Unocal and Falcon concluding that John was "not a Jones Act seaman," and suggested that the Sievers, therefore, had no valid claim against this defendant. After a hearing on September 28, 2001,[3] the trial court granted summary judgment and dismissed all the Sievers' claims against Epoch.[4] The Sievers appeal.

SUMMARY JUDGMENT
Appellate courts review summary judgments de novo under the same criteria that govern the trial judge's consideration of whether a summary judgment is appropriate. Guillory v. Interstate Gas Station, 94-1767, p. 5 (La.3/30/95), 653 So.2d 1152, 1155. A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). The summary judgment procedure is favored and shall be construed to accomplish the just, speedy, and inexpensive determination of actions. La. C.C.P. art. 966(A)(2).
The initial burden of proof is on the mover to show that no genuine issue of material fact exists. La. C.C.P. art. 966(C)(2). However, once the mover has made a prima facie showing that the motion should be granted, if the non-movant bears the burden of proof at trial on the issue before the court, the burden shifts to him to present evidence demonstrating that material factual issues remain. La. C.C.P. art. 966(C)(2); J. Ray McDermott, Inc. v. Morrison, 96-2337, pp. 10-11 (La. App. 1st Cir.11/7/97), 705 So.2d 195, 202-03, writs denied, 97-3055, 97-3062 (La.2/13/98), 709 So.2d 753, 754. The applicable substantive law determines the *735 materiality of facts in a summary judgment setting. See J. Ray McDermott, Inc., 96-2337 at p. 11, 705 So.2d at 203. Therefore, we now turn to a discussion of the requisite principles of a Jones Act action for damages.

JONES ACT RELIEF
The Jones Act, 46 U.S.C.App. § 688, provides in part, that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law." This statute was enacted with the purpose of removing the bar to a seaman's ability to recover damages in suits alleging negligence. Chandris, Inc. v. Latsis, 515 U.S. 347, 354, 115 S.Ct. 2172, 2183, 132 L.Ed.2d 314 (1995); Little v. Amoco Production Co., 98-1130, p. 4 (La.App. 1st Cir.5/14/99), 734 So.2d 933, 935, writ denied, 99-1752 (La.10/1/99), 748 So.2d 446. The Jones Act applies only to those plaintiffs who hold seaman status. See Little, 98-1130 at pp. 4-5, 734 So.2d at 935 (citing Chandris, 515 U.S. at 354-55, 115 S.Ct. at 2183, in discussing the lack of a statutory definition and the historical evolution of seaman status).
An inquiry into seaman status is fact-driven and will depend on the nature of the vessel and the worker's precise relation to it. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991). The United States Supreme Court articulated a twopronged test for seaman status in Chandris, 515 U.S. at 368, 115 S.Ct. at 2190; accord Harbor Tug and Barge Co. v. Papai, 520 U.S. 548, 554, 117 S.Ct. 1535, 1540, 137 L.Ed.2d 800 (1997). In order to be deemed a seaman, plaintiff must have (1) contributed to the function of the vessel or the accomplishment of its mission; and (2) had a connection to the function of the vessel or an identifiable group of vessels that was substantial in both duration and nature. See Chandris, 515 U.S. at 368, 115 S.Ct. at 2190; see Little, 98-1130 at p. 6, 734 So.2d at 936. The second prong of the seaman status test separates those "sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." See Chandris, 515 U.S. at 368, 115 S.Ct. at 2190.
The Supreme Court has held that in determining a plaintiff's seaman status, courts must examine the total circumstances of the worker's employment. See Chandris, 515 U.S. at 368, 370, 115 S.Ct. at 2191. And although it is not fixed in stone, the "rule of thumb" is that those workers who spend less than about 30 percent of their employment in the service of a vessel in navigation should not qualify as seamen under the Jones Act. Id., 515 U.S. at 371, 115 S.Ct. at 2191 (citing Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067 (5th Cir.1986)); see Little, 98-1130 at pp. 6-7, 734 So.2d at 936. Courts should not employ a snapshot test for seaman status, inspecting only the situation as it existed at the time of the accident. Chandris, 515 U.S. at 363, 115 S.Ct. at 2187. And not any maritime worker on a ship at sea as part of his employment is automatically a member of the crew of the vessel within the meaning of the statutory terms. Id.
The only item introduced into evidence by the parties at the hearing on the motion for summary judgment was the March 30, 2000 deposition of John. John testified that he was hired by Epoch on May 19, 1997, as a sample catcher trainee, which is a mud logger's helper, and he eventually became a mud logger. He explained that a mud logger's duty is to *736 interpret data from collection devices through a computer software package aboard the rig. John described that by sensors located through out the rig, information was distributed via computer-generated programs to "the unit," which he identified as a three-computer console about 20 feet by 10 feet in size that Epoch supplied to a vessel along with the mud loggers. From the information obtained from the unit, a mud logger logs the process, correcting any errors and interpreting the data. According to John, when the signals from the mechanized devices did not record properly, it was typically the job of the sample catcherwho acted as the eyes of the mud loggerto physically adjust the device that separated the sediment from the drilling mud allowing for the activity necessary for the sensors to record information to resume. John added that the main reason mud loggers are present on the rig during drilling operations was to gauge the gas content to avoid a large amount from coming up hole.
John stated that during the approximate one year he had worked for Epoch, he had been assigned to about twenty different rigs. And while the tour of duties of each assignment varied in duration, he averaged the length of time spent on each rig was between two and three weeks. John explained that typically a rig had four Epoch employees tending to mud logging duties: a mud logger and a sample catcher team would be assigned to a twelve-hour shift; and another mud logging team then replaced the preceding one. Unlike the employees of the drilling and oil companies who worked seven hours and then had seven hours off, mud loggers worked in longer twelve-hour shifts. And although the mud loggers stayed on the rig the duration of the hitch, sleeping on the premises and eating in the rig's galley, John described differences between the third-party quarters, reserved for those who were not rig personnel, in which he and the other mud loggers slept and the sleeping accommodations for rig personnel.
In elaborating about the various relationships among the companies aboard a rig, John testified that Epoch's customer was the oil companythe actual operatorand not the drilling company, although he added that a good rapport with the drilling company employees was important. John received his assignments from a land-based Epoch employee. And while the oil company/operator could request that a particular Epoch employee be removed from the rig, only Epoch had the power to hire and fire a mud logger.
John said that he worked on various types of rigs including fixed platforms, jack-ups, barges, and semi-submersibles. Generally, when John finished one hitch on a rig, he did not know exactly which rig to which he would next be assigned. And while on occasion, a mud logger would head home after working a hitch thinking he would return to the rig after a break, often when he obtained his assignment from Epoch it would be aboard a different rig.
John testified that he had been aboard Falcon # 32 from the end of April for about three weeks when he sustained his injury during a 20-hour shift, which had commenced at 6 P.M. on the evening of May 12. He recalled that about a week before, as a cost saving measure, the Unocal representative had sent the sample catchers home suggesting that the drilling operations would not be done in a rapid manner and that two mud loggers would suffice. Working alone, John was doing the sample catcher's job of physically adjusting the separating device when he sustained injury after contact with drilling mud. John was able to complete the tour *737 of duty aboard Falcon # 32. But due to industry-wide changes in oil prices, John explained that he did not return to work at Epoch after that hitch aboard Falcon # 32.
Without addressing whether John proved the first prong of seaman status test, i.e., that he contributed to the function of the vessel or the accomplishment of its mission, based on John's testimony we find that Epoch established that John lacks the requisite substantial connection to the function of the Falcon # 32 for seaman status. While John correctly points out that he proved he was on board the inland barge for 24 hours/day, that he was not free to leave or return home but was required to live, where he ate his meals and slept, this snapshot inspection of his employment situation as it existed at the time of the accident is not dispositive of the determination of whether John is a seaman. Looking at his job over the entire year he worked as a mud logger at Epoch, we note John's testimony that, in addition to the hitch aboard Falcon # 32 where he sustained injury, he also had been assigned to that inland barge for an earlier hitch. But he admits that the total amount of time that he was aboard Falcon # 32 performing mud logging services for Epoch was 29 days. Thus, Epoch has shown that John spent less that 30% of his time aboard Falcon # 32. Moreover, given his detailed account of his activities aboard Falcon # 32 including his mud logging duties from April 1998 until his accident, Epoch has shown that John's connection to Falcon # 32 was clearly a transitory or sporadic one.
Having failed to show factual support for a finding that John had a substantial connection to Falcon # 32, in order to defeat summary judgment on the issue of John's entitlement to seaman status, the Sievers suggest that they have proven that John had a substantial connection to the function of a group of identifiable vessels which defeated summary judgment in favor of Epoch.
In our de novo examination of the record on review of this assertion, we are guided by the historical concept of a "fleet" which, in the seaman status determination, means an identifiable group of vessels acting together or under one control. See Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1074 (5th Cir.1986). The notion that fleet of vessels in this context means any group of vessels an employee happens to work aboard was rejected. Id. Unless fleet is given its ordinary meaning, the fundamental distinction between members of a crew and transitory maritime workers such as longshoremen is totally obliterated. Id.; accord Waguespack v. Aetna Life & Casualty Co., 795 F.2d 523, 526 (5th Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 163 (1987).
John testified that he worked on various types of drilling rigs, including fixed platforms, jack-up rigs, drilling barges, and semi-submersibles and that the rigs were owned or operated by various different entities including Nabors, TransOceanic, and Falcon. John explained that Nabors was Epoch's parent company, and that he had worked on two Nabors' rigs: a fixed platform and a semi-submersible for a total of approximately six weeks. This is insufficient to show a substantial connection with the function of a group of vessels owned by Nabors.
The Sievers have failed to produce factual support sufficient to satisfy their burden of proving a substantial connection to an identifiable group of vessels acting together or under one control.[5] Accordingly, we *738 find no error in the trial Incourt's conclusion that the Sievers failed to prove seaman status to support an action for damages under the Jones Act.[6]

DECREE
For these reasons, the trial court's judgment dismissing the Sievers' claims against Epoch is affirmed. Appeal costs are assessed against John L. and Juanita Sievers.
AFFIRMED.
NOTES
[1] Although plaintiffs' surname is misspelled in the caption, throughout the opinion we correctly refer to them as "Sievers."
[2] Although in its answer this defendant referred to itself as "Spirit Energy 76, Inc.," we refer to it as "Unocal" in conformity with its reference in subsequent pleadings.
[3] The Sievers designated the transcript of the September 28, 2001 hearing as part of the appeal record. But because the hearing was not transcribed, it is not included in the record.
[4] The Sievers subsequently filed a "Motion for New Trial" pleading seeking a reconsideration of the trial court's conclusion that Epoch was entitled to a dismissal of all their claims, which was denied on January 30, 2002. It is from the denial of the motion for new trial that the Sievers lodged this devolutive appeal. But an order denying a motion for new trial is generally a nonappealable judgment, reviewable only under supervisory jurisdiction for abuse of discretion. Francis v. Hotard, XXXX-XXXX, p. 2 n. 1 (La.App. 1st Cir.3/30/01), 798 So.2d 982, 984 n. 1, writ not considered, XXXX-XXXX (La.6/22/01), 793 So.2d 1263. Without passing on the propriety of the Sievers' filing of a motion for new trial from the grant of a summary judgment, because the Sievers have clearly demonstrated an intention not to acquiesce in the summary judgment or to abandon their right to appeal by filing the motion for new trial, see Allen v. State ex rel. Ernest N. Morial New Orleans Exhibition Hall Authority, XXXX-XXXX, p. 3 n. 2 (La.4/9/03), 842 So.2d 373, 376 n. 2, and based on their appellate brief obviously intended to appeal both the grant of summary judgment and the denial of the new trial motion, mindful that appeals are favored and that as an interlocutory judgment that causes irreparable harm, the dismissal of the Sievers' claims against Epoch is appealable, see La. C.C.P. art. 2083, we find that the matter is properly subject to appellate review.
[5] The Sievers urge two bases precluded summary judgment. First, they suggest their response to an interrogatory, which was not introduced into evidence, supports a finding that John worked aboard Falcon rigs for 74 of the 209 days he worked for Epoch, evincing time at sea aboard a group of Falcon vessels beyond the 30% rule-of-thumb showing necessary for him to qualify as seaman. Close scrutiny of that response shows that of the 74 days John worked aboard Falcon rigs, 29 were aboard Falcon # 32 and 28 were aboard another Falcon barge. John's deposition testimony does not identify the type of Falcon rigs on which he worked the other 17 days. Thus, if we were to consider the response and, assuming Falcon # 32 and the other Falcon barge were "vessels in navigation" for Jones Act purposes, the Sievers have established only that 27.2% of John's at-sea employment was aboard an identifiable group of Falcon vessels. This showing is insufficient to confer seaman status upon John. The Sievers additionally assert that outstanding discovery prevents summary judgment because they have shown John had a substantial connection with the function of a group of vessels. But in that same response to Epoch's interrogatory, the Sievers admitted that John worked on rigs and a barge which were owned by various different entities, including TransOceanic, Falcon, Viking, Nabor, Penzoil, Cliff's, and Diamond, thereby conceding the lack of common ownership of the group of vessels. The Sievers also urge that Epoch failed to adequately respond to a request for production of things seeking documentation of John's work assignments. Despite an objection response, Epoch provided bi-weekly time sheets for John, which identified the "Client/Job Description." Importantly for purposes of our review is that while the Sievers propounded the request for discovery in September 1999, John's deposition was taken in March 2000, and they received written responses to the requested production of things from Epoch in July 2000, which included the employer's objections, at no time before the September 28, 2001 hearing did the Sievers move to compel the elicited documentation. See La. C.C.P. art. 1469. This outstanding discovery assertion was presented to the trial judge who, despite his familiarity with the case, refused to modify his decision. The Sievers simply failed to produce the requisite factual support necessary to establish that they will be able to satisfy their evidentiary burden of proof at trial. Thus, we find that neither of these bases precludes summary judgment.
[6] Epoch's motion expressly asserted the trial court's earlier conclusion that John is not a seaman in its grant of summary judgment in favor of Unocal and Falcon foreclosed any Jones Act claims the Sievers alleged against Epoch. Epoch further claimed entitlement to dismissal of any LHWCA or Louisiana Workers' Compensation claims on the basis of the district court's lack of jurisdiction, noting the federal courts' exclusive jurisdiction over LHWCA claims (see 33 U.S.C. § 913) and that of the Office of Workers' Compensation for Louisiana's compensation claims (see La. Const art. V, § 16A; La. R.S. 23:1310.3). See Chandris, 515 U.S. at 355-56, 115 S.Ct. at 2183-84 (Jones Act and LHWCA are mutually exclusive compensation regimes and the injured worker who is covered by neither federal compensation scheme may still be entitled to recovery under state workers' compensation scheme.) The parties have not raised error with the broad dismissal of "all claims" asserted by the Sievers against Epoch and, at oral argument, appellants' attorney stated that as "a practical matter" the dismissal terminated this lawsuit against Epoch. Thus, we do not address the propriety of the broad dismissal of all this injured employee's claims in the course and scope of his employment against his direct employer.