669 So.2d 1246 (1996)
James MILLER
v.
INTERNATIONAL DIVING AND CONSULTING SERVICES, INC., Fidelity and Casualty Company of New York, and ABC Boat Company.
No. 95-CA-873.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 1996.
Order Denying Rehearing March 18, 1996.
*1249 Paul C. Miniclier, Daniel J. Caruso, Alfred R. Gould, Jr., Simon, Peragine, Smith & Redfearn, New Orleans, for Defendants/Appellants.
Jeffrey C. Collins, Metairie, for Plaintiff/Appellee/Second Appellant.
*1250 Donald F. DeBoisblanc, New Orleans, for Intervenors.
Before GAUDIN, GRISBAUM, and GOTHARD, JJ.
GOTHARD, Judge.
Plaintiff, James Miller, was employed by International Diving and Consulting Services, Inc. (International) as an experienced diver aboard the lay barge, LPC-101. The LPC-101 is a pipe laying barge owned by Reliance Offshore Contractors (Reliance) which, at the time of the accident, was operating in the Gulf of Mexico. On the evening of April 20, 1990, Mr. Miller was on the bottom of the Gulf directing the movement of a "jet sled" by radio contact with the crew of the LPC-101. When his dive was over, he re-surfaced and began to ascend a ladder on the side of the barge. The ladder twisted, causing Miller's neck to snap backward severely. He became weak and clung to the ladder in danger of falling back into the water. Seeing the difficulty Miller was having, the dive tender, Paul Byfield, grabbed Miller's helmet and pulled him onto the barge. In the process of struggling to get onto the barge, Miller fell on the deck and hit his head on a large timber supporting the drag line track. Miller was helped out of his diving gear and into the decompression chamber. After the required period of decompression, Miller showered and reported the accident to Gary Smith, the diving supervisor.
Miller filed suit for personal injuries received in the accident. In the original and supplemental and amending petitions he sued his employer, International, the owner of the barge, Reliance, the vessel in rem, and various insurance companies. Miller designated the claim as an admiralty or maritime claim brought under the provisions of LSA-C.C.P. art. 1732(6)[1], thereby defeating a request for a jury trial by defendant, International. International filed a reconventional demand against Miller and a cross-claim against Reliance.
Prior to trial, plaintiff settled with Reliance and one of the insurance companies. Reliance did not make an appearance at trial to defend the cross-claim. After a bench trial on the remaining claims the court rendered an opinion, accompanied by extensive reasons for judgment, in which it found in favor of the plaintiff and awarded combined damages of $130,847.50. The court ruled against the plaintiff on issues of future damages, claims for additional maintenance and cure, and punitive damages. Both International and Miller appeal the judgment.
International assigns the following errors:
1. The trial court erred in finding that plaintiff/appellee was a Jones Act seaman.
2. The trial court erred in not finding Reliance negligent and/or the barge LPC-101 unseaworthy.
3. The trial court erred in failing to rule on the superseding and intervening accidents and events.
4. The trial court erred in holding that plaintiff/appellee reached maximum medical cure on September 9, 1992.
5. The trial court erred in awarding prejudgment interest.
Plaintiff assigns the following errors:
1. The trial court erred in failing to award James Miller full, sufficient and adequate monetary damages, including punitive damages.
2. The trial court erred in failing to give proper weight to the testimony of James Miller's treating physician.
3. The trial court erred in failing to find that James Miller's physical conditions were caused by his diving injury.
4. The trial court erred in finding that James Miller reached maximum medical cure and was able to return to work.

*1251 JONES ACT
Crucial to the judgment is the finding by the trial court that Miller was a Jones Act seaman. The correctness of that finding is the primary issue presented on appeal by defendant, International. Defendant argues the court erred in finding that plaintiff was a Jones Act seaman because he was assigned to a specific vessel or fleet of vessels at the time of his accident.
In reasons for judgment, the trial court stated:
The plaintiff was injured on April 21, 1990 while working as a commercial diver for the defendant, International Diving and Consulting Services, Inc., aborad (sic) the barge LPC-101. Plaintiff started work with International Diving in 1986.
Michael Williams testified that he owns International Companies. This entity consists of multiple companies, electrical, diving, etc. which are set up as corporations. On April 21, 1990, Williams owned and operated 100% of International Diving & Consulting Services, Inc. He also owned 50% of Reliance Offshore. Williams testified that International Diving was sold one year ago and Reliance is in the process of liquidation. Reliance owned the barge LPC-101 in April, 1990, and it was given to International Company for forgiveness of debt at the end of 1991. Both International Diving and Reliance share the same safety coordinator and risk manager, Mr. Gerald Ashker. Mr. Ashker served as the corporate representative throughout the litigation.
Williams testified that Reliance was laying pipe on April 21, 1990, and that the LPC-101 was a pipeline laying barge. The LPC-101 was towed by Reliance's tugboat to its position in the Gulf of Mexico where the pipeline in question was to be laid. Thereafter, the barge pulled itself through the water, using a system of anchors, cables and winches. The LPC-101 pulled a Reliance owned jet sled machine along the floor of the Gulf of Mexico. The jet sled machine would dig a trench into which the barge would lay its pipeline. The placement, alignment and directing of the jet sled machine was conducted by International Diving's commercial divers by radio communications from the floor of the Gulf of Mexico. Hence, plaintiff alleges that the movement of the barge was dictated by the jet sled machine and that International Diving's employees, including Mr. Miller, contributed to the pipeline laying mission of the barge and that they were involved in governing and guiding the movement of the LPC-101.
Ashker testified that International provided the diving crew to the barge and Reliance operated the pipe laying. He testified that the LPC-101 had its own captain, independent of the tug captain. David Favres was the LPC-101 captain and an employee of Reliance. Ashker testified that Gary Smith was the dive supervisor at the time of the accident. He testified that while underwater the dive crew would notify the barge as to the position of the jet sled. Ashker testified that the equipment and hydraulic fluid was (sic) owned by Reliance. The witness testified that they gave plaintiff $20 per day in maintenance payments and that he helped plaintiff make a claim for disability benefits. In August, 1992, plaintiff's maintenance and cure was stopped. Ashker claimed that plaintiff was not a member of a crew of a vessel or permanently assigned to a vessel. He claimed that, until the accident, the plaintiff worked at multiple sites for multiple clients on multiple vessels. He testified that the divers have no responsibility for the movement of the barge. However, on cross-examination he did not refute the fact that Miller had been assigned only to Reliance vessels six months prior to his accident.
At trial, testimony revealed that International Diving employees on the LPC-101 slept aboard the barge and were assigned to the barge for an indefinite duration in order to complete the pipeline laying job. The deposition testimony of Paul Byfield, Miller's diving tender, indicated that the *1252 International Diving crew was aboard the LP-101 (sic) for approximately one month following Miller's injury. Hence, it is apparent that these hitches lasted a considerable duration.
* * * * * *
Taking into consideration all of the facts of the case the Court finds that the plaintiff, James Miller, is a Jones act seaman.
As to the movement of the barge, Miller testified that he directed the movent (sic) of the vessel because he told the barge when they were "off line."
Williams, predictably, testified that plaintiff had nothing to do with the movement of the vessel.
Defendant argues that plaintiff's status as a diver does not except him from the identifiable fleet requirement for seaman status. Masterson v. Epic Divers, Inc., 804 F.Supp. 869 (E.D.La.1992). Defendant claims plaintiff was not permanently assigned to a specific vessel and did not perform a substantial part of his work onboard an identifiable fleet of vessels.
Williams testified at trial that Miller got into arguments with other barge captains and that a number of companies did not want him back. He claimed that he felt that for at least the last six months prior to the accident that Miller could only be assigned to a couple of vessels over which Williams, himself, had command and control. One such vessel was the LPC-101.
The Court finds Mr. Williams' testimony important in this regard because it establishes that Mr. Miller was only assigned to an identifiable vessel or fleet of vessels, for the purpose of establishing Mr. Miller's Jones Act seaman status. Mr. Miller worked exclusively aboard Mr. William's barge during the six month period leading up to this accident.
The Court has heard the career of Mr. Miller and the number of vessels he worked aboard and who owned the vessels while he was employed with International Diving. The argument could have been made that Mr. Miller was not assigned to an identifiable fleet of vessels prior to the last six months of his career. However, it is clear that Miller's mobility changed in the eyes of his employer when Mr. Williams decided to assign him only to the LPC-101, or to a limited number of other vessels he owned, operated or controlled.
Accordingly, the Court finds that Miller was involved with the navigation and mission of the vessel and was permanently assigned to an identifiable fleet of vessels at the time he was injured and that he enjoys seaman status for Jones act purposes.
Mr. Gerald Ashker, the marketing safety coordinator for both International and Reliance, testified that there was no written contract between International and Reliance. International furnished divers to Reliance to check certain aspects of the pipe laying operation such as the positioning of the jet sled. The entire pipe laying operation is run by Reliance employees. The LPC-101 was under the control of Captain David Fabre, a Reliance employee. The barge can propel itself by dropping anchors and attaching a cable to a winch on the barge. The winch is turned on and it moves the barge forward along the anchor chain. The diver's job is to make sure the jet sled is still in the trench, the pipe is still in it, and to see that nothing is misaligned.
Mr. Peter Williams, owner of International Companies, an overall management company which operates as a bank and does funding for the individual companies including International Diving, testified that in April, 1990 he was president of both International Diving and Reliance, as well as co-owner of both. He stated that LPC-101 was given to International Companies by Reliance in 1991 in payment of a debt.
He stated that he hired Mr. Miller in 1986 as a diver. Mr. Williams further testified that Mr. Miller had worn out his welcome on other jobs because of certain behavior, including drinking beer and fighting, and was *1253 assigned by a rotation method to the remaining jobs available.
Congress enacted the Jones Act in 1920 to provide a cause of action in negligence for "any seaman" injured "in the course and scope of his employment." 46 U.S.C.A.App. § 688. Because the term "seaman" was not defined in that act, the courts have fashioned various tests for establishment of seaman status under the Jones Act. It is clear that "seaman", as used in the Jones Act, is narrowed by the Longshoremen's and Harbor Workers' Compensation Act. 33 U.S.C. § 901, et seq. (LHWCA), which provides a compensation remedy for all maritime workers injured on navigable waters, except those employees who are "a master or member of a crew of any vessel" 33 U.S.C. § 902(3)(G); Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1070 (5th Cir.1986).
In Offshore Co. v. Robison, 266 F.2d 769 (5th Cir.1959), the court used a two pronged test for establishing seaman status under the Jones Act. In the Robison test, a worker seeking to establish Jones Act seaman status must show that he was assigned permanently to a vessel in navigation, or performed a substantial part of his work on a vessel, or identifiable fleet of vessels, and that his work contributed to the work or function of the vessel or to the accomplishment of its mission.
In Barrett, supra, the court considered the question of whether the test enunciated in Robinson should be modified. In that case, the court rejected the limited approach taken by the Seventh Circuit in Johnson v. John F. Beasley Construction Co., 742 F.2d 1054 (7th Cir.1984), which granted crew member status only to those workers who perform significant navigational functions or further the "transportation function" of the vessel. In consideration of the permanency requirement of the second prong of the Robison test, the Barrett court noted that the permanent assignment/substantial-performance test is stated in the disjunctive. The Barrett court found that a worker may qualify as a crew member if he does substantial work on a vessel even though his assignment to it is not permanent. 781 F.2d at 1073. In reaching that decision, the Barrett court defined "fleet of vessels":
By fleet we mean an identifiable group of vessels acting together or under one control. We reject the notion that fleet of vessels in this context means any group of vessels an employee happens to work aboard. Unless fleet is given its ordinary meaning, the fundamental distinction between members of a crew and transitory maritime workers such as longshoremen is totally obliterated. (Citations omitted) 781 F.2d at 1074.
More recently in McDermott International, Inc., v. Wilander, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d. 866 (1991), the United States Supreme Court visited the issue of Jones Act seaman status. The court assumed the term was used in the Jones Act in the same manner in which it was used in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), the case the Jones Act was intended to overrule. After an extensive analysis, the Supreme Court resolved the conflict between the Robison and Johnson tests on the issue of the transportation/navigation function requirement by holding; "(i)t is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work." Wilander, supra 498 U.S. at 355, 111 S.Ct. at 817.
In reaching that decision, the Wilander court pointed out that whether coverage is provided under the Jones Act or general maritime law, seamen do not include land-based workers. A seaman under the Jones Act is supposed to be a sea-based maritime employee. Wilander, 498 U.S. at 348, 111 S.Ct. at 814. "The key to seaman status is employment-related connection to a vessel in navigation." Id. 498 U.S. at 355, 111 S.Ct. at 817.
The Wilander court further explained that the determination of seaman status is a mixed question of fact and law.
....... When the underlying facts are established, and the rule of law is undisputed, *1254 the issue is whether the facts meet the statutory standard.
. . . . .
It is for the court to define the statutory standard. "Member of a crew" and "seaman" are statutory terms; their interpretation is a question of law. The jury finds the facts and, in these cases, applies the legal standard, but the court must not abdicate its duty to determine if there is a reasonable basis to support the jury's conclusion. If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a "member of the crew," it is a question for the jury. In many cases, this will be true. The inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it. (Citations omitted) Wilander, 498 U.S. at 356, 111 S.Ct. at 818.
The employer need not own the vessel, nor fleet of vessels, in order for the employee to qualify as a "seaman" under the Jones Act. Coats v. Penrod Drilling Corp., 5 F.3d 877 (5th Cir.1993); Patterson v. Weber Marine and Fireman's Fund Ins. Co., 92-0729 (La.App. 1 Cir. 4/8/94), 635 So.2d 686.
Commercial divers embody the traditional and inevitably maritime task of navigation, and have the legal protections of a seaman when a substantial part of their duties are performed on vessels. It is the inherently maritime nature of the tasks performed and perils faced by his profession, and not the fortuity of his tenure on the vessel from which he makes a particular dive on which he was injured, that makes a commercial diver a seaman. Wallace v. Oceaneering Int'l, 727 F.2d 427, 436 (5th Cir. 1984); Pickle v. International Oilfield Divers, Inc., 791 F.2d 1237, 1240 (5th Cir.1986).
In Pickle, supra, the plaintiff, a commercial diver, was injured when a surge of water threw him against the jacket leg of the platform from which he was diving. He was engaged in construction of an underwater brace on the fixed platform owned by a company other than his employer. Although Pickle was injured while diving from a platform, he was assigned to a barge at the time of the injury. The Pickle court used Barrett and Wallace to find Jones Act seaman status.
We find the circumstances of the instant case to be similar to those in the Pickle case. Consequently, we find the trial court correctly concluded the plaintiff was a Jones Act seaman.

NEGLIGENCE
The seaman's burden is featherweight and the seaman is entitled to his remedy against his Jones Act employer if the seaman proves that the Jones Act employer's negligence played any part, however small, in producing the seaman's injury. Davis v. Hill Engineering, Inc., 549 F.2d 314, 331 (5th Cir.1977); Brister v. A.W.I., Inc., 946 F.2d 350 (5th Cir.1991). In the reasons for judgment the trial court stated:
At trial, plaintiff alleged that International was negligent based on its control and ownership of the ladder. Plaintiff also alleged that they failed to maintain a safe work place. The Court is of the opinion that the plaintiff proved the negligence of defendant, International. There was testimony at trial pertaining to the ladder being too long and the water dragging the ladder causing it to twist. There was also testimony that the ladder was not rigged or placed correctly. International alleges that plaintiff has not proved by a preponderance of the evidence who actually rigged the ladder and alleges the (sic) it could have been solely accomplished by Reliance's riggers. The Court is of the opinion that plaintiff has proven by a preponderance of the evidence that the negligence involved with the ladder was in fact caused by International. Further, the Court finds that International failed to maintain a safe work place and that this contributed to plaintiff's injuries. Hence, plaintiff proved by a preponderance of the evidence that the shifting ladder caused his neck injury.
*1255 At trial the plaintiff stated that he injured his neck when his head snapped backward violently as the dive ladder he was ascending shifted. Although he stated he lost his footing when he was pulled onto the deck of the barge and hit his head on a timber, he is certain that the injury occurred on the ladder and not when he fell on the deck.
Mr. Jimmy Grundstrom, a fellow diver who was on the deck of the barge at the time of the accident, testified that he was about 20 feet away from the ladder and had a clear view of the area. He saw Miller ascend the ladder. Before Miller could get high enough to step onto the barge, the ladder twisted about 45 degrees. The barge tender grabbed Miller and pulled him onto the barge. Because Miller didn't have his balance, he fell to his knees. The weight of his helmet caused him to fall forward.
Both plaintiff and Mr. Grundstrom describe the ladder as an inferior one owned by International that came out to the barge with all of the other diving equipment on a crew boat. However, neither could testify as to who rigged the ladder. Paul Byfield, the dive tender, stated in his deposition that he did not know who rigged the ladder.
International maintains that Miller slipped after getting on board the LPC-101 due to the presence of grease and hydraulic fluid on the deck which leaked from the barge's equipment. International asserts it was that fall which caused the plaintiff's injury.
Mr. Ashker admitted that he did not know if any of Reliance personnel was on deck the night of the accident. He confirmed that there are two versions of the accident report. He admits that he added a reference to the accident report of slipping on the deck in grease, but he maintains that Mr. Miller authorized the change. The original report completed by the plaintiff contains no such reference, and the amended report was not initialed by the plaintiff. Mr. Miller denies stating that he slipped in grease, and he denies authorizing any change in the accident report. Given that testimony, we find no error in the trial court's ruling that the sole cause of plaintiff's injury was the improperly rigged ladder.
Both Mr. Miller and Mr. Grundstrom testified that standard diving procedures required four people, two divers and two tenders, to work on a dive such as this. However, International only had three employees, two divers and one tender, on this job. The fact that only three International employees were assigned to the dive is admitted, and the testimony concerning the required personnel was not disputed by witnesses for International, and is not seriously argued in brief to this court.
Given the evidence presented at trial, we find no manifest error in the trial court's finding that International was negligent.

LIABILITY OF RELIANCE
Also presented for review is the trial court's finding that International was solely liable for the accident. As previously stated, International filed a cross-claim against Reliance, charging that;
(1) Reliance was responsible for the condition of the deck and the appurtenances of the LPC-101.
(2) Reliance personnel negligently rigged the ladder used by plaintiff to reboard the LPC-101 following his dive.
(3) Those conditions and/or Reliance's negligence caused plaintiff's injuries.
International charges that Reliance is liable on a theory of unseaworthiness. International avers that Reliance as owner/operator of the vessel owed plaintiff a duty of maintaining a seaworthy vessel. International further asserts that Reliance breached this duty by allowing conditions on the deck of the barge to become dirty and dangerous by failing to clean up leaking hydraulic fluid, and by failing to keep appurtenances of the vessel (the dive ladder) properly functional.
Reliance settled with the plaintiff earlier and did not make an appearance at the trial on the merits. Further, Reliance did not file an appeal.
*1256 As to the first claim, International argues that Miller slipped in grease and hydraulic fluid after getting on the deck of the LPC-101. International maintains that the fall on deck was the cause, or at least, a contributing cause, of plaintiff's injury.
In order to prevail on an unseaworthiness claim, plaintiff must prove that the vessel was unseaworthy and the unseaworthy condition was the proximate cause of the injury. Youn v. Maritime Overseas Corporation, 605 So.2d 187 (La.App. 5th Cir.1992) modified on other grounds, 623 So.2d 1257 (La.1993). It is clear from the written reasons for judgment that the trial court found Miller's testimony, as it relates to causation of the accident, to be credible. Consequently, the court found no causal relationship between the conditions on the deck of the barge and the plaintiff's accident. The standard of review in maritime cases for the factual findings of the trial court are subject to review under the same manifest error standard as applied by Louisiana courts. Gaston v. G & D Marine Services, Inc., 93-182 (La.App. 4th Cir. 1/19/94), 631 So.2d 547; writ denied, 94-436 (La. 4/4/94), 635 So.2d 1112. Under that standard of review, the appellate court may not disturb the findings of the trial judge on the merits unless they are clearly erroneous. Sutton v. Central Gulf Lines, Inc., 433 So.2d 888 (La.App. 5 Cir.1983). Reviewing the record under that standard, we can find no manifest error in the trial court's ruling that any dirt on the deck of the barge was not a contributing factor in plaintiff's accident and injury. Nor do we find error in the trial court's ruling that the ladder was the sole cause of plaintiff's injury.
Since the trial court found a causal connection between the ladder and its improper rigging and the plaintiff's accident, the claim of unseaworthiness in that regard must be more deeply considered.
It is undisputed that the dive ladder was improperly tied down. It is also undisputed that the ladder was owned by International and was brought on board the barge with all of the diving equipment. However, who rigged the ladder is not apparent from the record. While International maintains it was Reliance personnel, testimony offered at trial does not substantiate that claim. In fact, there is no testimony as to who actually rigged the ladder, only that it was tied off in only one spot making it unstable. The trial court made the determination that the ladder was rigged by International employees. While that determination of negligence is necessary for the finding of liability on the part of International as a Jones Act employer, it is not relevant to the finding of unseaworthiness as to the vessel owner.
This Court has discussed the law in this regard in Youn, supra, 605 So.2d at 198:
The claims of negligence under the Jones Act and because of unseaworthiness are separate and distinct claims. Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).
Under general maritime law, a shipowner has an absolute duty to provide the members of his crew with a seaworthy vessel. A ship is unseaworthy unless it and all of its appurtenances and crew are reasonably fit and safe for their intended purpose. Miles v. Melrose, 882 F.2d 976 (5th Cir.1989), affirmed, Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). The duty of a shipowner to provide a seaworthy vessel is absolute; actual or constructive knowledge by the owner of the unseaworthy condition is not necessary to support liability. In addition, a showing of due diligence or lack of negligence by the owner will not negate liability. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). To prevail on an unseaworthiness claim, a plaintiff must show that the vessel was unseaworthy and that the unseaworthy condition was the proximate cause of his injury. Alverez v. J. Ray McDermott & Co., 674 F.2d 1037 (5th Cir.1982).
Under the Jones Act, a vessel owner is deemed negligent if he fails to exercise reasonable care to maintain a reasonably *1257 safe work environment. Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir.1982).
Under general maritime law, a shipowner has the absolute duty to provide the crew with a seaworthy vessel. Id. The vessel and all of the appurtenances and crew must be reasonably fit and safe for their intended purpose, otherwise, the vessel is unseaworthy. Youn, supra. The vessel owner's actual or constructive knowledge of the unseaworthy condition, his lack of due diligence or his negligence are not necessary to support liability, because his duty to provide a seaworthy vessel is absolute. Id.
In order to escape liability for unseaworthiness, the vessel owner must show that he has delivered a seaworthy vessel to a "bareboat" or "demise" charterer. To create a bareboat charter, the owner must completely and exclusively relinquish "possession, command and navigation" of the vessel to the charterer. Guzman v. Pichirilo, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962). The bareboat charterer is considered the owner pro hac vice of the vessel for liability purposes. Backhus v. Transit Cas. Co., 532 So.2d 447, 449 (La.App. 1st Cir.1988). Thus, if the charter is a bareboat charter, then the charterer is responsible for all damages arising from the operation of the vessel. Cantrelle v. Kiva Const. & Engineering, Inc., 630 So.2d 265, 273 (La. App. 1st Cir.1993).
There is no evidence that Reliance chartered the LPC-101. On the contrary, the evidence shows that Reliance personnel were in control of the barge throughout the pipe laying operation. Therefore, Reliance maintained control over the vessel and had an absolute duty to provide a seaworthy vessel. The fact that the unseaworthy condition is the fault of the worker's employer, and not the defendant, is immaterial to the claim of unseaworthiness. Bostrom v. Astro Crecido CIA, Nav. S.A., 477 F.2d 718, 720 (1st Cir. 1973).
International argues, we believe correctly, that the ladder became an appurtenance of the barge when attached. The doctrine of unseaworthiness encompasses a duty of a vessel owner to provide a reasonably safe means of access. Florida Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 330 (5th Cir. 1993). A vessel owner has a fundamental duty to provide its crew members with a reasonably safe means of boarding and departing from the vessel. Id.
The seaworthiness warranty is not limited to gear owned by the shipowner. Romero Reyes v. Marine Enterprises, Inc. 494 F.2d 866 (1st Cir.1974). In Romero, the court considered the liability of a vessel owner for a gangplank owned by another party.
... (W)hile the phrase "equipment appurtenant" to the vessel suggests equipment "belonging" physically to the vessel, it may, and in this case does, include equipment vital to the vessel's mission that does not accompany it while at sea. "Seaworthiness" comprehends the owner's duty to supply his crew with a suitable ship and equipment, and this includes providing them with a suitable means to board and disembark. The duty thus extends to the gangway by whomever supplied, owned or controlled, A crewman injured by an unfit hence "unseaworthy" gangplank may recover against the vessel's owner. Id. at 869.
We believe the same analysis can be applied to the instant case. Although, Reliance did not own the ladder, it had an absolute duty to see that the ladder was safe. Failure of that duty created liability on the part of the vessel owner. After reviewing all of the evidence presented, we assess 30% of fault to Reliance.
The fact that Reliance is liable to the plaintiff under the doctrine of unseaworthiness does not answer the question of whether a negligent tortfeasor (International) is entitled to indemnity and/or contribution from a non-negligent tortfeasor (Reliance) in admiralty law.
Although the doctrines of indemnity and contribution are related, they are *1258 distinguishable. The principle of indemnity permits one tortfeasor to recover all of its losses from another tortfeasor, provided that the latter should appropriately answer for the entirety of the loss. Hardy v. Gulf Oil Corp., 949 F.2d 826, 829-830 (5th Cir.1992). Under the concept of contribution, each tortfeasor pays the proportion of the damages that are attributable to its actions. Id.
The availability of indemnity under maritime law is quite limited. Hardy v. Gulf Oil, supra. For the most part, it has been replaced by principles of comparative fault when the court abandoned the admiralty rule of divided damages in United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); Hardy v. Gulf Oil, supra. Indemnity between maritime tortfeasors is now available only "where proportionate degrees of fault cannot be measured and determined on a rational basis" United States v. Reliable Transfer Co., supra 421 U.S. at 404, 95 S.Ct. at 1713. Few theories of indemnification survive in maritime law, none of which would allow recovery by a negligent tortfeasor absent a contractual obligation.
Contribution between joint tortfeasors is common in maritime law. There is, however, much discussion on the proper allocation of damages when, as in the instant case, the plaintiff settles with one or more of the tortfeasors prior to trial. The Restatement (Second) of Torts offers three possible resolutions:
(1) The money paid extinguishes any claim that the injured party has against the party released and the amount of his remaining claim against the other tortfeasor is reached by crediting the amount received; but the transaction does not affect a claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation.
(2) The money paid extinguishes both any claims on the part of the injured party and any claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation and seeks contribution.
(3) The money paid extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other tortfeasors by the amount of the equitable share of the obligation of the released tortfeasor.
Restatement (Second) of Torts § 886A, pp. 343-344 (1977).
The Federal Fifth Circuit Court of Appeals offers conflicting views. In Leger v. Drilling Well Control, Inc., 592 F.2d 1246 (5th Cir.1979), the court adopted the third Restatement approach, reasoning that a judgment awarded to a claimant must be reduced by the dollar amount that represents the proportion of negligence, if any, attributable to settling parties. Id. 1249; Hardy v. Gulf Oil Corp., supra. However, in Hernandez v. M/V RAJAAN, 841 F.2d 582 (5th Cir.1988), cert. denied, 488 U.S. 981, 109 S.Ct. 530, 102 L.Ed.2d 562 (1988), the court concluded that the correct way to allocate damages is to reduce the award to a claimant by the dollar amount actually received by the claimant in the settlement. While the court recognized the conflict in Hardy v. Gulf Oil Corp., supra, it did not resolve the issue.
More recently the United States Supreme Court reviewed the law in this area and ruled that the liability of nonsettling defendants in admiralty cases should be calculated with reference to the fact finder's allocation of proportionate responsibility, rather then by giving nonsettling defendants credit for the dollar amount of settlement. McDermott, Inc. v. AmClyde, ___ U.S. ___, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). In accordance with that rule of law, we reduce the award of damages to the plaintiff by 30% to reflect the assessment of fault to Reliance.

DAMAGES
In the next two assignments of error, International seeks review of the trial court's assessment of damages. International argues *1259 that, in awarding damages the trial court failed to take into account certain superseding and intervening events, such as a pre-existing cervical condition and a subsequent traffic accident.
Additionally, the plaintiff assigns the award of damages as an error for our review, asserting the award does not sufficiently reimburse plaintiff for all the damages he sustained.
The plaintiff, a fifty-year-old man who had been a commercial diver for over 20 years, testified that he had no problems with his neck before the accident. He further testified that he severely cut his left ear in a traffic accident which occurred about eighteen months after the accident aboard the LPC-101. He denied that the traffic accident worsened his neck problems. He stated that he has been in considerable pain since the diving accident and has been unable to return to his job. He has been under a doctor's care and has incurred over $37,000.00 in medical expenses due to the diving accident. He maintains that he is still in too much pain to work.
Dr. John Watermeier, the orthopedic surgeon who treated Mr. Miller, testified that the plaintiff had a pre-existing arthritis condition in his neck which was made symptomatic by the injury on the barge. Dr. Watermeier further testified that Mr. Miller has been in constant pain since the accident and required surgery, a three-level fusion on his spine, to relieve the pain. Plaintiff may need a second surgery.
Dr. Earl Rozas, an orthopedic surgeon to whom Mr. Miller was sent by International immediately after the accident, testified that the plaintiff had decreased and painful range of motion of his right shoulder and had suffered an acute cervical strain superimposed on a degenerative disease of the cervical spine. Dr. Rozas conducted various diagnostic tests and concluded that the period of recovery could last up to one year. He disagreed that surgery was indicated, and suggested that plaintiff is complaining of pain in order to continue obtaining pain relieving drugs legally.
Karen Durham the owner of the restaurant, Friends on the Tchfuncte, testified that Miller was employed by the restaurant from September 9, 1992 to September 26, 1992 as a kitchen helper at the rate of $5.00 per hour. He was fired because he came in too inebriated to perform his duties. Harry Williamson, the executive chef of the restaurant verified that testimony.
The trial court ruled that the defendant was disabled from the date of the accident, April 20, 1990 until September 9, 1992, the date he took the job in the restaurant. Based on that finding, the trial court awarded $60,000.00 in general damages, as well as 71,847.50 in past loss wages in accordance with the testimony of Dr. Melville Wolfson, an expert in forensic economy. The trial court found that the surgery performed by Dr. Watermeier was not necessitated by the accident, and that any disability which prohibits plaintiff from returning to diving is related to the surgery and not to the accident. Consequently, the court did not award damages for future economic loss.
The testimony is adequate to support the award given by the trial court. This Court may alter an award in admiralty cases only after a determination of an abuse of the high degree of discretion afforded the trial court. Youn v. Maritime Overseas Corp., supra. Because we find no such abuse of that discretion in this case, we find no merit in the argument of either the defendant or the plaintiff in regard to the award of damages. We have reviewed the entire record and find International's assertion, that all factors were not considered, is without merit. There is extensive testimony, both lay and medical, to show the relationship between both the previous cervical condition and the subsequent traffic accident, and the injury sustained by the plaintiff in the maritime accident.

MAINTENANCE AND CURE
The record shows that International paid maintenance and cure for two years after the accident, until August 21, 1992. The trial *1260 court found that the plaintiff reached maximum cure on September 9, 1992, when he found a job at a restaurant. Both parties assign that ruling as error. International says the plaintiff reached maximum cure much sooner than September 9, 1992. International offers three alternative dates for maximum cure, the latest of which is December 16, 1991, the date of the traffic accident.
Plaintiff argues maintenance and cure should continue beyond the September 9, 1992 date. He asserts that he was forced to take the job in the restaurant in September, 1992 only because International discontinued his maintenance and cure payments one month before in August, 1992. Plaintiff stated that he was unable to perform the job because of pain and was forced to quit. He denies being fired for showing up drunk. Further, plaintiff argues the trial court should have awarded punitive damages for failure to pay maintenance and cure.
In Porche v. Maritime Overseas Corp., 550 So.2d 278, at 280 (La.App. 4 Cir. 1989), the court summarized the well established law in regard to maintenance and cure:
When a seaman becomes ill or injured while in the service of his ship, the ship owner must pay him maintenance and cure, whether or not the shipowner was at fault or the ship unseaworthy ... This obligation includes paying a subsistence allowance, reimbursing medical expenses actually incurred, and taking all reasonable steps to ensure that the seaman receives proper care and treatment. Morales v. Garijak Inc., 829 F.2d 1355 (5th Cir.1987).
Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).
A ship owner who arbitrarily and capriciously denies maintenance and cure to an injured seaman is liable to him for punitive damages and attorney's fees. Yelverton v. Mobile Laboratories Inc., 782 F.2d 555 (5th Cir.1986).
We note that any ambiguities or doubts in the application of the law of maintenance and cure are to be resolved in favor of the seaman. Gaspard v. Taylor Diving and Salvage Co., 649 F.2d 372 (5th Cir.1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982). Given the facts of this case, we find no error in the trial court's ruling. The factual finding that the plaintiff reached maximum cure when he began employment with the restaurant is supported by the evidence contained in the record, and will not be overturned by this Court.
Further, we do not agree that International should be held in judgment for punitive damages for failure to pay adequate maintenance and cure. The behavior necessary for such a penalty has been described as "callous and recalcitrant', arbitrary and capricious" and "willful, callous, and persistent". Holmes v. J. Ray McDermott & Co., 734 F.2d 1110, 1118 (5th Cir.1984); Porche v. Maritime Overseas Corp., supra. We find no behavior on International's part which would give rise to an award of punitive damages to the plaintiff in this matter. International paid maintenance and cure for two years after plaintiff's injury. That payment was only slightly more than one month short of what the trial court held was due.

PRE-JUDGMENT INTEREST
The final issue presented for our review by International is the award of prejudgment interest. In the judgment, the trial court awarded interest from date of demand. International asserts that such an award constitutes legal error. We disagree. When an action is brought under the Jones Act and general maritime law the award of pre-judgment interest is discretionary with the trial judge. Danos v. McDermott, Inc., 563 So.2d 968 (La.App. 1st Cir.1990), writ not considered, 566 So.2d 386 (La.1990); Theriot v. McDermott, Inc., 611 So.2d 129 (La.App. 1 Cir.1992).
*1261 For the foregoing reasons, the judgment of the trial court is amended to assign 30% liability to Reliance, and affirmed as amended.
AMENDED AND AFFIRMED AS AMENDED.
PER CURIAM.

MOTION FOR REHEARING DENIED
Appellee's application for rehearing and motion to dismiss appellant's appeal are denied. Appellee seeks a rehearing to consider the motion to dismiss the appeal of defendant, Certain Underwriters of Lloyd's of London, the excess insurer and co-defendant of International Diving Company, Inc. This court cannot dismiss an appeal for failure to file a brief pursuant to Rule 2-8.6 Uniform Rules-Court of Appeal absent the mandatory thirty day notice. Both defendants were represented by the same counsel at trial. Further, both were included in the same motion for appeal. We considered the issues addressed in the brief to be common to both defendants, and find no reason to grant a rehearing in this matter.
NOTES
[1] A trial by jury shall not be available in:

(6) A suit on an admiralty or general maritime claim under federal law that is brought in state court under a federal "saving to suitors" clause, if the plaintiff has designated that suit as an admiralty or general maritime claim.